WILLIAM I. KOCH *vs.* COMMISSIONER OF REVENUE.

Suffolk. May 5, 1993. - December 14, 1993.

Present: LIACOS, C.J., WILKINS, LYNCH, & O'CONNOR, JJ.

*Taxation,* Appellate Tax Board: findings; Income tax; Gross income; Corporation. *Corporation,* Stock, Corporate entity.

On appeal by the Commissioner of Revenue from a decision of the Appellate Tax Board concluding that a taxpayer had effectively transferred his shares of stock in a closely held corporation to twenty-five Delaware Subchapter S corporations, of which he was the sole stockholder, prior to the sale of those shares to the closely held corporation; that the transfer "was not just a formality, but was done in pursuit of [the taxpayer's] long range investment and business objectives"; and that, in consequence, the taxpayer had not received payment for the shares and owed no State income tax for the capital gain attributable to the amount the closely held corporation paid for them, this court held that the findings of the board were based on substantial evidence and supported the board's conclusion that the Subchapter S corporations, and not the taxpayer, had sold the stock. [545-557]

APPEAL from a decision of the Appellate Tax Board.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Eric A. Smith,* Assistant Attorney General, for the Commissioner of Revenue.

*Arthur R. Miller (Edward F. Hines, Jr.,* with him) for the taxpayer.

O'CONNOR, J. William I. Koch (taxpayer), a Massachusetts resident, reported on his Federal income tax return for 1983 a net long-term capital gain of $275,349,470 from 25 Subchapter S corporations which were incorporated in Delaware and did no business in Massachusetts. Internal Revenue Code § 1366, 26 U.S.C. § 1366 (1993), which in substance was also the provision in effect in 1983, allows gains or losses

from a Subchapter S corporation to pass through a corporation and be attributed directly to its shareholders. In contrast, Massachusetts, in 1983, attributed Subchapter S income to the corporation. G. L. c. 62, § 2(*a*)(2)(B), as appearing in St. 1973, c. 723, § 2.[1] On schedule D of his 1983 Massachusetts income tax return, under the caption, "Differences, if any [between Federal and Massachusetts capital gains]," the taxpayer subtracted $275,332,555 in capital gains from Subchapter S corporations. The defendant Commissioner of Revenue (commissioner) assessed a Massachusetts tax on those gains, plus interest and penalties, to the taxpayer, who paid the total amount and then filed an application for abatement. The abatement was deemed denied due to the commissioner's inaction, G. L. c. 58A, § 6, and G. L. c. 62C, § 39, and the taxpayer appealed to the Appellate Tax Board (board). The board concluded that the commissioner had exceeded his authority in assessing the tax, and therefore ordered abatement. The commissioner appealed to the Appeals Court pursuant to G. L. c. 58A, § 13, and that court reversed the board's decision. 33 Mass. App. Ct. 707 (1992). We granted the taxpayer's application for further appellate review and, disagreeing with the Appeals Court, we now affirm the board's decision.[2]

The board's findings are detailed and comprehensive, and our careful review of the administrative record satisfies us that those findings are supported by substantial evidence. Indeed, there is little dispute about the subsidiary facts, as dis-

---

[1]This provision was subsequently revised by the Massachusetts Legislature to allow gains and losses incurred by Subchapter S corporations to pass through to the shareholders as provided by Internal Revenue Code § 1366. See St. 1986, c. 488, § 25; St. 1988, c. 202, § 3.

[2]The parties' Appeals Court briefs were refiled here. In addition, both parties filed supplemental briefs. The commissioner has moved to strike an addendum to the taxpayer's supplemental brief which consists of the board's forty-five page opinion with the taxpayer's book and page references to evidence in the administrative record that the taxpayer contends supports the board's findings. The addendum is helpful, and we perceive no unfairness in our consideration of it. Accordingly, we deny the commissioner's motion to strike.

tinguished from the inferences to be drawn from them. An abridged recitation of the board's findings follows. The capital gains in question were incurred as a result of the redemption by Koch Industries, Inc., of stock held by its minority shareholders in settlement of a long and bitter dispute over the operations, management, and control of that corporation. Koch Industries, Inc., was based in Wichita, Kansas, and was founded by the taxpayer's father, Fred C. Koch. Fred C. Koch had four sons, Frederick R., Charles G., David H., and the taxpayer, all of whom held stock in the corporation either directly or in trust. Other relatives also held corporate stock. The taxpayer was the beneficial owner of 2,309,160 shares of which about 40% was held in trusts established by his father. The trustees were the taxpayer and the First National Bank of Wichita. The bank was also cotrustee under similar trusts established for Charles and David. In the mid-1970's the taxpayer placed some of his stock in a family trust of which Charles and the bank were the trustees.

Charles was chairman and chief executive officer of the corporation from the time of his father's death in 1967. The taxpayer began working for the corporation out of his home in Wellesley, Massachusetts, in 1974, and in 1979 he became vice president for corporate development. He was also a director. After the taxpayer began working for the corporation in 1974, disagreements developed between him and Charles over the management of the corporation. By 1979, the disagreements had become serious. Directors' and shareholders' meetings became shorter and less frequent. The board of directors was not informed of management decisions and actions. The taxpayer, who was the only witness before the board besides his Wichita attorney, Robert Martin, testified that his brother was running the corporation as if it were a one-man business.

During 1979 and 1980, the taxpayer tried to persuade Charles to change his operation of the company and the treatment of minority shareholders. After the taxpayer authored a memorandum voicing his concerns, Charles attempted to fire the taxpayer at the next directors' meeting.

In defense, the taxpayer formed a coalition of shareholders, which controlled about 52% of the voting stock, with a view to calling a special shareholders' meeting to elect additional members to an expanded board of directors or to elect new members by cumulative voting. When Charles refused to call the special shareholders' meeting, the taxpayer called it. However, before the date set for the meeting, Charles induced the First National Bank to revoke proxies it had given to the taxpayer and Frederick to vote the shares of which the bank was cotrustee. With the help of another, Charles also persuaded a minority shareholder to sell his shares to Charles and David. As a result, the coalition's control was reduced to no more than 48%, and the shareholders' meeting did not take place. At their next meeting, the directors fired the taxpayer as an officer and employee of the company.

In 1981, Koch Industries, Inc., had seven directors, four of whom supported Charles and management and three of whom represented the minority shareholders. Charles, David, and others allied with Charles placed all the shares they held outright into a voting trust to assure their continued control of the corporation. The members of the minority coalition also placed the shares they held outright into a voting trust in order to protect their continued representation on the board and ensure that none of them would weaken and sell out. The trustees for the minority coalition were the taxpayer and Frederick, with one vote each, and two others with one vote between them. The trust document required the consent of two thirds of the trustees to sell all the shares held by the trust, and the consent of all the trustees to sell a lesser number.

In 1982, Kansas law required a corporation to have cumulative voting and precluded exclusion of minority shareholders from representation on the board of directors. Although the taxpayer was therefore a director, he was excluded from meetings of an executive committee which was the effective governing body. He learned only through a newspaper that Koch Industries, Inc., was going to buy an oil refinery for $150,000,000 and was planning to sell all the assets of a divi-

sion of the corporation for $198,000,000. Thereupon, he advised the corporation that, if it continued to conduct its business through an executive committee, ignoring the board of directors, the minority shareholders would bring suit. That suit was filed in the United States District Court for Kansas on October 12, 1982. The suit asserted both direct shareholder rights against the corporation and derivative rights on behalf of all shareholders, the latter being claims of the corporation against its officers for injuries done to the corporation. Among other things, the complaint charged the individual defendants with involving the corporation in a Federal oil and gas lease lottery scandal, diverting corporate funds to support political activities of Charles and David in the Libertarian party, involving the corporation in litigation and administrative proceedings relative to government claims of unpaid taxes and Department of Energy claims of improper pricing of oil products, and exposing the corporation to civil suits resulting in judgments for fraud. The defendants filed answers to the suit, and Charles and the corporation counterclaimed against the taxpayer alleging libel and slander and asserting damages in the sum of $160,000,000.

The parties engaged in extensive discovery and filed related motions to compel and for protection. According to the board's findings, attorney "Robert Martin, who represented the [taxpayer] at the hearings, testified that [the deposition of the taxpayer, which lasted five days in December, 1982] was the most acrimonious of thousands of deposition hearings which he had attended during his career." By early June, 1983, the court's order to the corporation to produce documents and a related contempt petition were pending, and depositions of two of Charles' supporters at Koch Industries, Inc., repeatedly rescheduled at their counsel's request, were scheduled for mid-June. During the last two weeks of May, the board found, "[T]he defendants surprised the plaintiffs' counsel with an offer of settlement."

In connection with the proposed settlement, a stock purchase and sale agreement was executed just before midnight on Saturday, June 4, 1983, by Koch Industries, Inc., as

buyer, and the taxpayer and Rocket Oil Co., a plaintiff in the
Federal court action, as principal sellers. Among other
things, the agreement provided that, on the closing date,
which would be September 6, 1983, "or earlier on 24 hours'
written notice by the corporation," the principal sellers would
deliver their shares to the corporation and the corporation
would pay for them, that the corporation's duty to purchase
depended on the sellers fulfilling certain warranties, and that
the sellers' obligation depended on the corporation's fulfil-
ment of its warranties. The sellers' warranties included a
warranty that the trustees of their voting trust would approve
the agreement, and the corporation's warranties included a
warranty of the veracity of its balance sheets and the absence
of material changes in its financial condition subsequent to
December 31, 1982. The agreement also provided that the
corporation's obligation to purchase was conditioned on the
sellers' furnishing "duly executed releases," and the sellers'
obligation was contingent on the principal trusts joining the
agreement as sellers. Neither the corporation nor the sellers
were required to consummate the deal in violation of a court
order.

In the board's findings, which appear in its memorandum
of decision under the heading "Findings of Fact and Re-
port," the board occasionally states that the taxpayer or At-
torney Martin "testified" concerning certain facts that the
board then articulates in detail. It is clear from that heading,
as well as the context and the fact that, although there was
much documentary evidence, the taxpayer and Attorney
Martin were the only witnesses before the board, that the
articulated facts are the board's findings. Neither party sug-
gests otherwise.

The board found that the taxpayer did not control the
other minority shareholders and that "[i]t was not a foregone
conclusion that all of them would join" in the stock purchase
and sale agreement. "The joinder of the principal trusts as
sellers was essential" to the taxpayer because if he "sold only
the stock he held directly, the shares held in trust for him
would become worthless as part of an even smaller minor-

ity." In that regard, the board found, "Having seen how Charles dealt with other shareholders he wanted to remove, the [taxpayer] had reason to distrust him. Charles had also been a director of the First National Bank of Wichita since the 1960's and was a close friend of its chief executive officer." The board also found that "[i]n view of the withdrawal of proxies by the First National Bank as co-trustee in 1980, its cooperation seemed far from reliable." The board made many other findings, warranted by substantial evidence, indicating that, on June 4, it was far from certain that the stock purchase and sale agreement would be consummated: (1) "a change of a few dollars in oil or petroleum-product prices could make a big difference in [the corporation's] balance sheet and operating statements"; (2) since the agreement called for sale of all the stock of the voting trust of the minority shareholders, only two votes were required, the taxpayer's and either Frederick's or the half votes of the other two trustees, but neither Frederick nor the other trustees were controlled by the taxpayer; (3) there was a possibility that shareholders who had not joined in the Federal court action would seek to enjoin the sale. "Like his attorney, Mr. Martin," the board states, the taxpayer "considered the chances of closing to be no better than fifty-fifty and believed that Charles would complete the agreement only if he thought it in his best interest to do so."

The board further found as follows: "Monday, June 6, [1983,] was the first business day after the execution of the Agreement. During that week the [taxpayer] began arranging his affairs to accommodate the funds that he would receive if the Agreement were to be completed according to its terms. He intended to engage in activities in oil and oil trading, acquiring an oil terminal, as well as in new business ventures in energy, real estate, and high technology. To avoid exposing his entire net worth to bad business decisions or risky ventures, and to maximize his investment flexibility, he decided to form a number of corporations. [The taxpayer] pointed out that Koch Industries itself had about 150 subsidiaries to limit its liability. He also wanted to take advantage

of the substantial federal and state tax advantages provided under Subchapter S, paying only one tax on the income earned by each corporation instead of a tax on each corporation's income plus a personal tax on distributions. Since a Subchapter S corporation cannot have subsidiaries, he had to have more than one S corporation. He formed the corporations in Delaware under Delaware law to take advantage of Delaware's favorable business corporation laws. His intended operations would be taking place outside of Massachusetts, which has no coal or oil.

"The corporations were formed under Delaware law by certificates of incorporation executed on June 7, 1983, and filed in Delaware on June 8 and 9. Since the Stock Purchase and Sale Agreement required the written permission of the parties for assignment, an amendment was executed on June 8 to permit the [taxpayer] to assign to one or more corporations of which he was sole shareholder any or all shares of the stock held in his name or held in trust for him under the 1981 voting trust. . . . To avoid a 20-day waiting period and the corporation's right of first refusal under the articles of incorporation of Koch Industries, record or beneficial holders of voting common shares executed consents to the [taxpayer's] transfer of his shares to corporations of which he was the sole shareholder on June 8 and 9. . . . On June 9, the [taxpayer] was designated as president and treasurer of each of the corporations, the election of Subchapter S status was made, and an account was opened at Banque de Paris et des Pays-Bas in New York for each corporation. On that date, the [taxpayer] also executed documents of 'assignment' to each corporation of a number of his shares of voting and non-voting common stock of Koch Industries. By this time the certificates had been gathered from the bank in Wichita and delivered to Morgan Guaranty Trust Co. to be held in escrow pending completion of their redemption by Koch Industries in accordance with the terms of the Agreement. . . .

"The available evidence shows that after these actions were accomplished, the [taxpayer] learned that Koch Indus-

tries had sent a letter dated June 9 to Paul, Weiss [New York law office] and Morgan Guaranty Trust Co., the escrow agent, notifying them that the closing would take place on June 10, 1983, at 10 a.m. at the Paul, Weiss offices, as provided in the Agreement. . . . Exhibit 19 contains copies of various other documents related to the closing on June 10: consent letters of the individual trustees of the principal trusts to the First National Bank in Wichita, [dated] June 4; joinder agreements by the principal trusts, [dated] June 6; approval of the voting trustees of the 1982 voting trust, [dated] June 10; resignation letters of minority directors, [dated] June 9; releases by parties to the suit, [dated] June 7, 8, and 10; and motion to dismiss the suit, [dated] June 10. The signature of the First National Bank in Wichita as cotrustee was obtained only after negotiation and the satisfaction of a demand for 'exit fees.' . . . Joinder agreements of individuals and trusts as seller affiliates were executed on June 5 and 6. . . . On June 10 no injunctions or restraining orders were in effect, there were no breaches of warranty regarding the corporations's financial condition, and all of the buyer's and sellers' conditions had been fulfilled. At the closing the escrow agent delivered the shares held in escrow to Koch Industries, including those it was holding for the Delaware corporations and those the [taxpayer] had kept in his own name, and transferred the proceeds of the sale to the bank accounts of the Delaware corporations. . . . No stock certificates were ever delivered to the Delaware corporations.

"The [commissioner of revenue] asks the board to find that the [taxpayer] did not sustain his burden of proof that (1) he made a valid assignment of his shares to the Delaware corporations and (2) that the sale was a sale by the Delaware corporations and not in substance a sale by him. The [commissioner] contends (1) that there was no delivery of the shares to the corporations and that under the Uniform Commercial Code an effective transfer did not take place; (2) that the [taxpayer] merely executed instruments of assignment, but there was no evidence that these were ever delivered to the Delaware corporations; (3) that the stock certifi-

cates themselves were in the possession of the escrow agent, with stock powers endorsed in blank; (4) that title to the shares could have been assigned to the Delaware corporations only by physical delivery of the certificates to them; (5) that there is no evidence that the corporations took part in the closing in any way; and finally, (6) that counsel for Koch Industries assumed that 'the shares of stock heretofore deposited by William I. Koch, together with his duly executed stock powers, [would] be delivered to Koch Industries, Inc., on Closing and [would] perfect title in Koch Industries, Inc. without the requirement of further signature or action of the corporate transferees.' . . .

"The board found that whether or not the instruments of assignment were delivered to the Delaware corporations, and notwithstanding that the shares were in the possession of the escrow agent, the [taxpayer] made a valid assignment of his interest in Koch Industries to the Delaware corporations and that the subsequent sale of the stock to Koch Industries was a sale by the Delaware corporations and not by the [taxpayer]. Indeed, since the documents of assignment relinquished the [taxpayer's] rights to deal with the shares as owner, the escrow agent could not legally have delivered the shares to Koch Industries without express authorization by the Delaware corporations, in which the [taxpayer] could have participated only in his capacity as an officer of each corporation.

"Next, the [commissioner] asks the board to find that (even if the [taxpayer] validly assigned his shares to the Delaware corporations) the sale of the stock to Koch Industries was in substance a sale by the [taxpayer] and not by the Delaware corporations. The board found that the conditions requisite for such a finding, as analyzed in the Opinion below, were not fulfilled. The board also found that the [taxpayer's] transfers of shares to the Delaware corporations were not mere 'anticipatory assignments of income,' so as to justify taxing him on the gain realized on the subsequent redemption of the stock by Koch Industries. The board found

that, on the contrary, they were bona fide transfers of the shares themselves for valid independent business purposes.

"In support of its contention that the transaction was in substance a sale by the [taxpayer], the [commissioner] also urges the board to find that there was no evidence that when the [taxpayer] assigned his shares to the Delaware corporations, the consummation of the Stock Purchase and Sale Agreement was unlikely, or that the closing would be prevented by failure of any of the conditions of its completion. Although it was probable that the plaintiffs in the suit would follow the [taxpayer's] lead in doing what was required to settle the suit, the board found that at the time of the assignment there was substantial uncertainty as to whether, during the time provided for completion, the other minority shareholders would join in the Agreement as sellers; whether Koch Industries would carry out its agreement to redeem its shares at the agreed price; whether the financial condition of Koch Industries would prove to be and would continue to be acceptable; whether the First National Bank in Wichita would consent to the sale of the stock of which it was a co-trustee; whether no disaffected shareholder would seek a restraining order or injunction; and whether Koch Industries would be able to raise the funds required for redemption. The [commissioner's] suggestion that some of the conditions provided were 'mere boilerplate' . . . does not diminish their importance in the parties' evaluations of their respective positions under the Agreement. On the contrary, the evidence suggests that all of the buyer's and sellers' conditions were carefully drafted to fit the particular situation in which the parties found themselves on June 4, 1983, whereas a financing condition was deliberately omitted as unacceptable to the sellers. Even if it is assumed that all of the conditions required of Koch Industries would be fulfilled in time for the scheduled or postponed closing, it was not clear that it would not be to the interest of the corporation to delay performance of its part of the bargain until late in the allotted time. It was in the interest of the sellers, on the other hand, to prepare themselves as soon as possible to perform their part of the

Agreement in the event that the corporation gave notice for performance in 24 hours. From this point of view, it is of little significance that the corporation scheduled the closing for June 10 rather than allowing it to take place of September 6, the last day provided by the Agreement.

"The board accordingly granted an abatement of the [commissioner's] additional assessment for 1983 and all interest and penalties assessed thereon, amounting to $19,669,246.89, plus statutory interest."

The board's "[o]pinion," fairly condensed, is as follows. The commissioner's notice of intent to assess stated, "The exclusion from your Massachusetts gross income of long term capital gains that you attributed to your Sub-S corporations is disallowed. This gain is directly taxable to you as a long term capital gain from the sale of stock (Sec. 482 of the Internal Revenue Code per Sec. 1 & 2, Chapter 62 Massachusetts General Law)." The board states: "Being the sole shareholder in each of the S corporations, the [taxpayer] properly included in his federal gross income on his individual return the full amount of the gain reported by each corporation on the Koch Industries shares redeemed on June 10, 1983. Under G. L. c. 62, § 2(a) Massachusetts gross income is federal gross income with certain additions and deductions. In tax year 1983 Massachusetts did not recognize S corporations. Under the law then in effect, amounts excluded from federal gross income under Subchapter S of the Code were required to be added (G. L. c. 62, § 2(a)(1)(E)), and amounts included in federal gross income under Subchapter S of the Code were required to be deducted [G. L. c. 62, § 2(a)(2)(B)] in arriving at Massachusetts gross income. Having included the gains in his federal gross income, the [taxpayer] deducted them on his Massachusetts individual income tax return. There is no question that as a matter of form this deduction was proper. . . ."

The board thereafter states, "Essentially, the [commissioner] makes two arguments in support of his assessment: (1) the [taxpayer] did not effectively transfer his stock to the S corporations before it was redeemed by Koch Industries on

June 10; and (2) even if the transfer of the stock was effective, the gain realized by the S corporations can be attributed to the [taxpayer] under one or more of several federal attribution rules that apply to the transfer. Since the [taxpayer's] self-assessment on his Massachusetts return was correct on its face, it is incumbent on the [commissioner] to establish the facts that would justify his making a different assessment."

The commissioner's first argument to the board, referred to above, was that, under the Uniform Commercial Code, G. L. c. 106, § 8-309, "an indorsement of a certificated security . . . does not constitute a transfer until delivery of the certificated security on which it appears or, if the indorsement is on a separate document, until delivery of both the document and the certificated security." In response, the board relied on G. L. c. 106, § 8-313, which also was the law of New York, where the transactions were executed. Chapter 106, § 8-313 (1992 ed.), provides: "(1) Transfer of a security . . . to a purchaser occurs only: (a) at the time he. or a person designated by him acquires possession of a certificated security; . . . [or] (e) with respect to an identified certificated security to be delivered while still in the possession of a third person, not a financial intermediary, at the time that person acknowledges that he holds for the purchaser." The board reasoned that Morgan Guaranty Trust was not a "financial intermediary" as defined in the statute, but instead acted as an escrow agent which, after the taxpayer assigned the shares to the S corporations, was holding the shares for the S corporations, not for the taxpayer individually. The board concluded that the escrow agent delivered the securities to Koch Industries, Inc., on behalf of the S corporations and paid the purchase price into their accounts at the June 10 closing. The board saw "no reason to doubt that the [taxpayer] here validly and effectively transferred his shares in Koch Industries to the S corporations on June 8 and 9, 1983."

The board then moved on to the commissioner's second argument, which essentially was that, even if the taxpayer did

transfer his stock in Koch Industries, Inc., to the S corporations before the stock redemption, the S corporations' subsequent sale of the stock to the corporation on June 10 in fulfilment of the stock purchase and sale agreement was a sale by the S corporations in form only. According to the commissioner, the sale in substance was by the taxpayer and, as a result, the transaction between the taxpayer and the S corporations was no more than his anticipatory assignment of income to them. The board recognized that "[o]n this theory, under federal tax decisions, the gain ostensibly realized by the S corporations could be attributed and taxed to the [taxpayer]." The board stated: "In order to establish that the sale of stock to Koch Industries was in substance a sale by him and not by the S corporations, the [commissioner] must first establish that the [taxpayer's] transfer of the stock to the S corporations was one of form only, and not of substance."

In considering whether, even if there was an effective transfer of the stock from the taxpayer to the S corporations, the sale to Koch Industries, Inc., nevertheless was, in substance, a sale by the taxpayer, the board focused on four considerations: (a) whether the transfer to the S corporations had a "legitimate purpose other than tax reduction"; (b) "the certainty or uncertainty of proceeds being received"; (c) "whether the transfer include[d] the property which produce[d] the income"; and (d) "whether the [taxpayer] has or has not parted with control over the property transferred." The board's opinion explains, with citation to Federal case law, that (1) "[w]here a taxpayer's transfer of assets has no other purpose than reduction or avoidance of taxes, federal cases have held that income or gain eventually realized on the assets may be attributed to him for tax purposes", (2) "[a] transaction may be found to be an assignment of income if the income was certain to be received before the property was transferred"; (3) "[s]everal cases have turned on whether the owner of income-generating assets has transferred only the proceeds, or both the asset and its proceeds ('tree and fruit')"; and (4) "[a] taxpayer who retains rights

of control over assets ostensibly transferred or continues to deal with them as his own property risks being taxed on any proceeds received by the transferee."

The board reasoned that the taxpayer's assignment of his Koch Industries, Inc., stock to the S corporations "was not just a formality, but was done in pursuit of his long range investment and business objectives outside Massachusetts. The proceeds of redemption went not to him but to the corporations through which he intended to, and subsequently did, carry out those objectives." In addition, the board observed that, "in view of past experience, the [taxpayer] was justified in wondering whether the [redemption] would take place within the time provided. It is not disputed that the [taxpayer] assigned the shares themselves and not just the gain that would be realized if and when they were redeemed. Finally, the [taxpayer] relinquished any right to treat the shares as his own property when he placed the certificates in escrow pending completion of the Agreement. In order to transfer them to the S corporations, he had to secure the written permission of all parties to the Agreement. After the [taxpayer] had assigned the shares, under the terms of the modified Agreement the escrow agent could deliver them only to Koch Industries for redemption. When the proceeds were paid over to the S corporations, they did not belong to the [taxpayer] as an individual to treat as his own; he could deal with them only through the corporations he had established to conduct his business enterprises. Assuming that under different facts the federal assignment-of-income doctrine[3] would have any application in Massachusetts, therefore, none of the conditions that would justify a finding of

---

[3]At the outset of the hearing before the board, the taxpayer and commissioner stipulated that: "The Commissioner's contention in this proceeding is that [the taxpayer's] purported assignment in 1983 of stock in Koch Industries, Inc. to certain corporations situated in Delaware was an attempt to assign his matured right to income from the sale of such stock. The Commissioner is not proceeding on any legal theory which relies upon a contention that these corporations were sham corporations or which contests that the corporations were engaged in valid business activities after the sale of the stock."

anticipatory assignment of the gain realized on redemption of the shares, and consequent attribution of the gain to the [taxpayer] as an individual, were present in this appeal." The board concluded as follows: "Having determined that the [taxpayer] effectively transferred his shares to the S corporations before the Stock Purchase and Sale Agreement was carried out, and that the transfer was not a mere formality to reduce taxes but was carried out in the execution of the [taxpayer's] substantive business objectives, the board holds that the [commissioner] lacked authority to include the gain realized by the S corporations in the redemption of the Koch Industr[ies] stock in the [taxpayer's] Massachusetts gross income."

A decision of the board will not be reversed or modified if it is based on substantial evidence and on a correct application of the law. *Commissioner of Revenue* v. *Wells Yachts South, Inc.*, 406 Mass. 661, 663 (1990). *M & T Charters, Inc.* v. *Commissioner of Revenue*, 404 Mass. 137, 140 (1989). In reviewing mixed questions of fact and law, the board's expertise in tax matters must be recognized, and its decisions are due "some deference." *McCarthy* v. *Commissioner of Revenue*, 391 Mass. 630, 632 (1984), quoting *French* v. *Assessors of Boston*, 383 Mass. 481, 482 (1981). See *Commissioner of Revenue* v. *McGraw-Hill, Inc.*, 383 Mass. 397, 400-401 (1981).

The commissioner argues that the board misstated and, inferentially, misunderstood the issue before it, and misplaced the burden of proof as well, thus necessitating reversal. We do not agree. The board states, "At issue in this appeal is the authority of the Commissioner of Revenue to attribute and assess to a resident individual *capital gains realized by foreign corporations* of which he is the sole shareholder on shares which he had assigned to them after the execution, but before the completion, of a legally binding agreement to sell the shares to the corporation that issued them" (emphasis added). That statement of the issue, the commissioner contends, assumes the ultimate fact in question, that is, that the capital gains from the redemption of Koch Industries,

Inc., stock were realized by the S corporations rather than the taxpayer. The commissioner's position is that the gains were not realized by the S corporations; they were realized by the taxpayer. In addition, the commissioner points to the board's statement that "[s]ince the [taxpayer's] self-assessment on his Massachusetts return was correct on its face, it is incumbent on the [commissioner] to establish the facts that would justify his making a different assessment," as demonstrating that the board erroneously placed the burden of proof in this matter on the commissioner. "The taxpayer has the burden of proving as a matter of law [his] right to an abatement of the tax." *M & T Charters, Inc.* v. *Commissioner of Revenue, supra* at 140.

It is true that the single statement of the issue, viewed in isolation from the rest of the board's memorandum, suggests that the board failed to understand the issue confronting it, but it is abundantly clear from the memorandum as a whole that the board fully understood that the principal issue was whether it was the taxpayer or the S corporations that realized the gain on the redemption of the Koch Industries, Inc., stock. It is also true that, viewed in isolation, the board's statement that "it is incumbent on the [commissioner] to establish the facts that would justify" his assessing the capital gains tax in question to the taxpayer suggests that the board placed the burden of proving the material facts on the commissioner. However, in this regard, too, a fair reading of the entire decision makes clear that the board looked to the taxpayer and not the commissioner for proof of the salient facts. Indeed, the board made specific findings, based in large measure on the testimony of the taxpayer and his attorney, in response to what the board described as the commissioner's request that the board "find that the [taxpayer] did not sustain his burden of proof that (1) he made a valid assignment of his shares to the Delaware [S] corporations and (2) that the sale was a sale by the Delaware corporations and not in substance a sale by him." The board made no suggestion that the commissioner's assertion that the burden of proof rested on the taxpayer was wrong. We construe the board's state-

ment that it is incumbent on the commissioner "to establish the facts that would justify" his position as simply requiring the commissioner, in order to prevail before the board, to convince it that, given its findings, the law authorized the assessment made by the commissioner.

The commissioner argues that the board's conclusion that the taxpayer effectively transferred his shares to his Delaware S corporations before the closing on the sale to Koch Industries, Inc. of its stock was not supported by substantial evidence. He further argues that, even if the transfer to the S corporations was effective, and therefore as a matter of form the S corporations sold the stock to Koch Industries, Inc., the board's "decision must be reversed because its conclusion that the Delaware corporations sold the stock 'in substance' was legally erroneous." The commissioner argues that, under the appropriate legal standard, the S corporations were "mere conduits." In addition, the commissioner argues that the "step transaction analysis," employed by the Appeals Court, 33 Mass. App. Ct. 707, 713-716, like the "conduit theory," requires the conclusion that in substance, the taxpayer was the seller of the stock redeemed by Koch Industries, Inc. We reject these arguments for all the reasons carefully expressed in the board's memorandum of decision. Although we recognize that the board did not discuss the step transaction analysis in its memorandum, we agree with the commissioner that that analysis and the conduit theory are "closely related." We are satisfied that the board's subsidiary findings were based on substantial evidence, and that the board's inferences therefrom and application of the law were sound. Therefore, we affirm the decision of the board abating the tax.

*So ordered.*