## BILL DeLUCA ENTERPRISES, INC. *vs.* COMMISSIONER OF REVENUE.

Suffolk. February 10, 2000. - April 26, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Taxation,* Corporate excise, Abatement. *Administrative Law,* Substantial evidence. *Constitutional Law,* Taxation.

Where the "tax benefit rule" embodied in 26 U.S.C. § 111(a) excluded from its scope deductions taken for depreciation, the gains realized from the disposition of depreciated property were includable in taxable income, under both Federal and Massachusetts law [319-322], and the assessment of a State excise tax on such gains for the 1989 tax year, which at that time allowed neither the carry forward nor carry back of net operating losses, did not violate art. 44 of the Massachusetts Constitution [322-325]: the decision of the Appellate Tax Board denying the taxpayer an abatement for that year was based on substantial evidence and a correct application of the law.

APPEAL from a decision of the Appellate Tax Board.

The Supreme Judicial Court granted an application for direct appellate review.

*Richard J. Hindlian* for the taxpayer.

*Juliana deHaan Rice,* Assistant Attorney General (*Anne T. Foley* with her) for Commissioner of Revenue.

ABRAMS, J. Pursuant to G. L. c. 58A, § 13 (1998 ed.), the taxpayer appeals from a decision of the Appellate Tax Board (board). The board affirmed the Commissioner of Revenue's (commissioner) denial of the taxpayer's application for abatement of its 1989 corporate excise taxes. The taxpayer, Bill De-Luca Enterprises, Inc. (DeLuca), is a New Hampshire corporation qualified to do business in Massachusetts.[1] DeLuca's primary business is leasing vehicles subject to purchase options.

---

[1] Bill DeLuca Enterprises, Inc. (DeLuca), is the principal reporting corporation for Federal and Massachusetts tax purposes for the following wholly owned subsidiary corporations: Lease and Rental Management Corporation; Mr. Rent-A-Car, Mr. Lease-A-Car, Inc.; Executive Auto Lease, Inc.; Executive

DeLuca filed a consolidated Federal income tax return and a combined Massachusetts corporate excise return for itself and its subsidiary corporations for the 1989 tax year.[2] See 26 U.S.C. § 1501 (1988). Subsequently, DeLuca filed an application for abatement of its 1989 Massachusetts excise taxes pursuant to G. L. c. 62C. On the application, DeLuca stated that, under Federal law, the company could take full advantage of depreciation deductions by applying excess deductions[3] from one year to subsequent years' taxes. See 26 U.S.C. § 172 (1988).[4] Federal law assessed a tax on "recaptured income" — income generated by selling over-depreciated assets. See 26 U.S.C. § 1245 (1988). DeLuca claimed that it should be granted an abatement because Massachusetts law, which did not allow it to carry forward excess deductions to subsequent years' income, nevertheless taxed all the recaptured income. See G. L. c. 63, § 30 (5) (*b*) (ii) (1988 ed.).

The commissioner failed to act on the application, and the application was deemed denied. See G. L. c. 58A, § 6. The taxpayer appealed to the board, which issued a decision in favor of the commissioner in August, 1997. The board issued findings of fact and conclusions of law in June, 1999. This court granted the taxpayers's application for direct appellate review. We will not reverse a decision of the board "if it is based on substantial evidence and on a correct application of the law."[5] *Koch* v. *Commissioner of Revenue*, 416 Mass. 540, 555 (1993). We affirm the decision of the board.

1. *The Massachusetts excise tax.* General Law c. 63, § 32 (1988 ed.), imposes an excise tax on domestic business corporations. A portion of the Massachusetts excise tax is calculated as a percentage of the company's "net income determined to be

---

Auto Lease of New Hampshire; Bill DeLuca Chevrolet, Inc.; and Auto Credit Rehab Corp., Inc.

[2]DeLuca's claims for abatement involve tax years 1989 and 1992-1994. DeLuca and the Commonwealth stipulated that the board's decision as to the 1989 tax year would be binding as to the other years as well. This court has before it information pertaining to the 1989 tax year only.

[3]"Excess deductions" refer to the amount by which the taxpayer's deductions exceeded its income. The term does not carry any implication that the deductions were improper.

[4]Unless otherwise noted, there are no material differences between the current statutes and regulations and those in effect for the 1989 tax year.

[5]See also G. L. c. 58A, § 13 (1998 ed.) ("[t]he decision of the board shall be final as to findings of fact").

taxable in accordance with the provisions of this chapter." G. L. c. 63, § 32 (*a*) (2) (1988 ed.). Net income is defined in c. 63 as the "gross income less the deductions, but not credits, allowable under the provisions of the Federal Internal Revenue Code (I.R.C.), as amended and in effect for the taxable year." G. L. c. 63, § 30 (5) (*b*) (1988 ed.).[6] Therefore, the portion of the corporate excise tax based on the taxpayer's net income must be determined with reference to provisions of the Federal tax code.[7] Two figures factor into the calculation of that portion of a corporation's excise tax based on the corporation's net income: (1) the deductions allowed to a corporation under the I.R.C.; and (2) the corporation's gross income, as defined in the I.R.C. We discuss each of these in turn.

2. *DeLuca's pre-1989 depreciation deductions.* DeLuca made large purchases of new vehicles in the years preceding 1989. Pursuant to depreciation methods specified in the I.R.C., DeLuca calculated its depreciation deduction using the "Accelerated Cost Recovery System" in some years and other accelerated depreciation methods in other years. See 26 U.S.C. §§ 167 & 168 (1988). Although some flexibility is allowed under 26 U.S.C. § 168 regarding the depreciation method used by the taxpayer, the I.R.C. specifies that the "[s]alvage value shall be treated as zero," 26 U.S.C. § 168 (b)(4) (1988), and that the applicable recovery period for automobiles shall be five years, 26 U.S.C. § 168 (c)(1) & (e)(3)(B)(i) (1988). According to DeLuca, however, the salvage value and recovery period specified in the I.R.C. differed from the actual salvage value and useful life of its vehicles. DeLuca states that the actual useful life of the vehicles averaged approximately six and one-half years, and the actual average salvage value of the vehicles was approximately thirty-five per cent of their original value. Therefore, even over the life of the vehicles, DeLuca's deductions on its Federal income tax returns for the depreciation of the vehicles' value significantly exceeded the actual decline in value of the vehicles.

---

[6]This provision corresponds with the current G. L. c. 63, § 30 (4) (1998 ed.).

[7]General Laws c. 63, § 30 (5) (*a*) (1988 ed.), defines gross income as that term is "defined under the provisions of the Federal Internal Revenue Code." See G. L. c. 63, § 30 (3) (1998 ed.), for the current analog of this provision. The Federal Internal Revenue Code (I.R.C.) includes in gross income the type of income at issue in this case. See 26 U.S.C. § 61 (a) (3) (1988) (including "[g]ains derived from dealings in property").

Because of the accelerated depreciation methods, and because DeLuca increased its fleet size significantly in the years preceding 1989, the company's depreciation deductions were so large that, along with other deductions, they exceeded the company's income. Thus, for Federal income tax purposes, DeLuca reported a net operating loss (NOL) for each of the tax years between 1985 and 1988, inclusive. Massachusetts law requires taxpayers to use the same definition of income and depreciation method on their State tax returns as on their Federal tax returns. See G. L. c. 63, § 30 (1988 ed.). Therefore, for purposes of the Massachusetts excise tax, DeLuca also reported NOLs in those years.

Federal law permitted DeLuca to carry forward and carry back the excess NOLs from one tax year to another. 26 U.S.C. § 172 (1988). Massachusetts law did not. G. L. c. 63, § 30 (5) (*b*) (ii) (1988 ed.).[8] The tax implications of this difference between Federal and State law did not affect DeLuca's tax position until 1989, the first year in which the company reported a positive net annual income on its Federal and State tax returns.

3. *DeLuca's 1989 tax position and income.* In 1989, DeLuca's rate of purchasing new vehicles slowed significantly. In addition, DeLuca sold a portion of its fleet. The amount which DeLuca could deduct for the depreciating value of its fleet, therefore, decreased.

DeLuca also realized capital gains from the sale of part of its fleet of vehicles. Under 26 U.S.C. § 1245 (1988), certain property "which is or has been property of a character subject to the allowance for depreciation" is classified as "section 1245 property." DeLuca's vehicles were § 1245 property.

Section 1245 of the I.R.C. also provides for the taxation of gains realized on the disposition of § 1245 property. Under § 1245, the amount of the gain is calculated using the "adjusted basis" of the property.[9] Section 1016 of the I.R.C. provides for the "[a]djustment to basis." 26 U.S.C. § 1016 (1988). Under

---

[8]The Massachusetts Legislature has since amended these provisions, but significant differences remain. Currently, Massachusetts taxpayers may carry forward NOLs for only five years, and they may not carry back NOLs. See G. L. c. 63, § 30 (5) (*b*) (ii) (1998 ed.). Federal law allows the carry forward of NOLs for fifteen years and the carry back of NOLs for five years. See 26 U.S.C. § 172 (1994 & Supp. IV 1998).

[9]We discuss only the provisions relevant to DeLuca's situation, i.e., those addressing the sale of § 1245 property for which an accelerated depreciation deduction was allowed. See 26 U.S.C. § 1001(a) (1988) (specifying calcula-

§ 1016, the original basis of the property must be adjusted to account for depreciation and deductions related to the property. 26 U.S.C. § 1016(a)(2) (1988).

For its 1989 Federal taxes, DeLuca adjusted the basis for the vehicles it sold, as required by the I.R.C. DeLuca then calculated its gains from the sale of the vehicles using the adjusted basis. Because of the differences between the amount of the depreciation deductions and the actual decline in the value of the vehicles, DeLuca reported significant gains after making these calculations. Section 1245 reclassifies, or "recaptures," such gains as ordinary income.[10] Therefore, this amount became part of DeLuca's gross income for Federal and State taxation purposes.

As a result of these gains, DeLuca reported taxable income for the 1989 tax year in excess of one million dollars. For Federal tax purposes, DeLuca was able to reduce this amount using NOLs carried forward from previous years' excess deductions. See 26 U.S.C. § 172 (1988). Massachusetts, however, did not allow the carry forward of NOLs from previous years, see G. L. c. 63, § 30 (5) (*b*) (ii) (1988 ed.), and, therefore, imposed an excise tax on the entire amount of taxable income.[11]

4. *Discussion.* DeLuca's application for abatement is based on the fact that, although the transactions involving the vehicles spanned a number of years, the company was required to figure its depreciation losses and pay taxes on a yearly basis. For Massachusetts tax purposes, DeLuca was able to use portions of its depreciation deductions to offset its taxable income in the years in which the depreciation deductions were taken. However, as DeLuca asserts, it was not able to make use of excess depreciation deductions from previous years to offset its 1989 taxable income in Massachusetts. Nevertheless, both Massachusetts and

tion of gain using adjusted basis); § 1011(a) (1988) (defining adjusted basis with reference to § 1016).

[10]Absent this provision, the gains would be taxed as capital gains. Section 1245 had more impact when the tax rate on capital gains differed significantly from the tax rate on ordinary income. See White, Realization, Recognition, Reconciliation, Rationality and the Structure of the Federal Income Tax System, 88 Mich. L. Rev. 2034, 2065 (1990) ("[s]ection 1245 was designed to prevent a taxpayer from taking advantage of this lower capital gains rate with respect to any gain that arose simply because of depreciation in excess of the actual diminution in value of the asset").

[11]DeLuca reports that its 1983-1996 aggregate State recapture income exceeded its Federal taxable income by more than $10 million.

Federal law required that DeLuca adjust the basis for the vehicles it sold in 1989 by the amount of the depreciation deductions it claimed in previous years, without regard to whether its taxes had been, or could be, reduced by those deductions. See 26 U.S.C. §§ 1016 & 1245 (1988); G. L. c. 63, § 30 (1988 ed.).

DeLuca argues that its 1989 Massachusetts income from the sale of the vehicles should be adjusted downward to the extent that no tax benefit inured to the company from depreciation deductions for those vehicles. DeLuca bases its argument on its interpretation of the Federal "tax benefit rule" and on the Massachusetts Constitution. For the reasons set forth, *infra*, we conclude that the board's denial of DeLuca's application for abatement is consistent with both the relevant I.R.C. provisions and the Massachusetts Constitution.

(a) *Tax benefit rule.* DeLuca argues that the exclusionary form of the "tax benefit rule," as codified at 26 U.S.C. § 111(a) (1988), operates to exclude from its net income the amount of any depreciation deductions for which no tax benefit inured to the company.[12] The exclusionary form of the tax benefit rule allows taxpayers to exclude from their taxable income any "income attributable to the recovery during the taxable year of any amount deducted in any prior taxable year to the extent such amount did not reduce the amount of the tax imposed." 26 U.S.C. § 111(a) (1988). DeLuca argues that the money it received for the depreciated vehicles constituted a "recovery" under § 111(*a*) and that, therefore, it should be allowed to exclude from its taxable income that portion of the gain representing depreciation deductions that did not result in a tax benefit. DeLuca grounds its claim on a Federal provision because, in defining income, G. L. c. 63, § 30 (1988 ed.), refer-

---

[12]The *inclusionary* form of the rule allows the government to tax otherwise untaxable income to the extent the taxpayer received a benefit from taking a deduction for the transaction that produced that income. See *Hillsboro Nat'l Bank* v. *Commissioner of Internal Revenue*, 460 U.S. 370, 377-378 (1983). For instance, where a creditor claims a loss deduction on an unpaid debt in one year, the creditor will be required to *include* in his taxable income in later years any subsequent payment on the debt. See *id.* The *exclusionary* aspect of the rule would allow the taxpayer to *exclude* from income any portion of the later repayment for which the taxpayer did not receive the benefit of a deduction. See *id.* DeLuca correctly observes that the United States Supreme Court cases discussing the tax benefit rule involve its inclusionary aspect. See, e.g., *Hillsboro Nat'l Bank* v. *Commissioner of Internal Revenue*, *supra.*

ences the I.R.C. Therefore, DeLuca's statutory claim rests on the interpretation of the applicability of that Federal statute.

Since its enactment, § 111(a) has been consistently interpreted to exclude from its scope deductions taken for depreciation. Federal regulations in force when DeLuca filed its 1989 returns specify that "[s]ection 111 provides that income attributable to the recovery during any taxable year of bad debts, prior taxes, and delinquency amounts shall be excluded from gross income to the extent of the 'recovery exclusion' with respect to such items. The rule of exclusion so prescribed by statute applies equally with respect to all other losses . . . made the basis of deductions from gross income for prior taxable years . . . *but not including deductions with respect to depreciation, depletion,* amortization, or amortizable bond premiums" (emphasis supplied). 26 C.F.R. § 1.111-1(a) (1985).[13]

The exclusion of depreciation deductions from § 111 appears to have been a generally accepted principle. An article on the tax benefit rule, which was cited by the Court in *Hillsboro Nat'l Bank* v. *Commissioner of Internal Revenue*, 460 U.S. 370, 381 (1983), notes that "the sole statutory remedy for a taxpayer incurring deductions for depreciation, amortization, and depletion in a loss year is the net operating loss carryover authorized by Internal Revenue Code section 172." Bittker & Kanner, The Tax Benefit Rule, 26 UCLA L. Rev. 265, 279 (1978).

Excluding depreciation deductions from tax benefit treatment under § 111(a) provides a sensible interpretation of the statute in light of the fact that Congress intended accelerated depreciation to serve as a tax benefit in and of itself. "The purpose of accelerating cost recovery deductions is to reduce the income tax liability of taxpayers in order to encourage their purchase and use of capital goods. Taking into account the time value of money, accelerated deductions reduce the present value of tax to be paid by deferring payment to later years." H.R. Rep. No. 98-432 (pt. 2), at 209, 98th Cong., 2d Sess., reprinted in 1984 (U.S.C.C.A.N.) 697 (House Ways and Means Committee Report

---

[13]The relevant language remains the same in the current Code of Federal Regulations (C.F.R.). DeLuca argues that this regulation, "promulgated by the I.R.S. in 1956[,] . . . is no longer valid [and] . . . has not been revised to reflect subsequent amendments to the Internal Revenue Code." As we discuss, *infra*, because the regulation remains in the C.F.R. and is consistent with the applicable statutory language and relevant legislative history, we consider it in our analysis.

on Deficit Reduction Act of 1984). Congress has consistently viewed accelerated depreciation deductions as an investment incentive — a benefit given to businesses that invest in new capital goods in return for deferral of part of their taxes. See, e.g., H.R. Rep. No. 101-247, at 2156, 101st Cong., 1st Sess., reprinted in 1989 (U.S.C.C.A.N.) 1906 ("The investment incentives provided by accelerated depreciation were designed to encourage investment in new plant and equipment"). For Congress, then, the accelerated depreciation deduction provides a tax benefit because it allows the taxpayer to defer payment of taxes on income representing a large portion of the cost of new equipment purchases. That the taxpayer later may have to pay taxes on part of this amount does not negate the initial tax benefit. See H.R. Rep. No. 98-432 (pt. 2), *id.* at 192 ("In general, the tax benefits of ownership of tangible property include depreciation or accelerated cost recovery deductions and investment tax credits"). Thus, DeLuca has received a tax benefit from the use of its depreciation deductions.

Limiting the scope of § 111(a) to deductions for losses other than depreciation also provides the most coherent reading of the I.R.C. as a whole. "We construe statutes to give reasonable effect to all the statutory provisions and create a consistent body of law." *PGR Mgt. Co., Heath Props.* v. *Credle*, 427 Mass. 636, 640 (1998). The I.R.C. sections providing for the taxation of gains realized on the disposition of depreciable property do not distinguish between property for which a depreciation deduction was taken and property for which no deduction was taken. A taxpayer must compute gains on the disposition of depreciable property using a basis adjusted for the amount of depreciation allowed under the I.R.C., even if the taxpayer neither took nor benefited from a tax deduction.[14] Thus, under DeLuca's interpretation, § 111(a) would apply to those taxpayers who took a depreciation deduction, but not to those taxpayers who did not. Nothing in the I.R.C. suggests that different treatment

[14]Section 1245 of the I.R.C. reclassifies gains realized from the disposition of depreciable property as ordinary taxable income. Gains are computed as specified in 26 U.S.C. § 1016, which provides that the basis of depreciated property should be adjusted "to the extent of the amount (A) allowed as deductions . . . but not less than the amount allowable under this subtitle or prior income tax laws." *Id.* at § 1016(2). The regulations for § 1016 state that "[a] taxpayer is not permitted to take advantage in a later year of his prior failure to take any [depreciation] allowance or his taking an allowance [that is] plainly inadequate . . . ." 26 C.F.R. § 1.1016-3(a)(1)(ii) (1987).

should be afforded to otherwise similarly situated taxpayers on this basis.

The I.R.C., the legislative history, and the Federal regulations all point to the conclusion that § 111 (*a*) does not exclude from taxable income the gain realized from the disposition of depreciated property, even if no tax benefit, other than the use of accelerated deduction, inured to the taxpayer. DeLuca's claim under the Federal tax statutory provisions therefore fails. Because, under Massachusetts law, income is defined by reference to the I.R.C., see G. L. c. 63, § 30 (1988 ed.), DeLuca's statutory claim fails under Massachusetts law as well. We turn now to DeLuca's claim that the taxation of this income violates the Massachusetts Constitution.

(b) *Constitutional claim.* Article 44 of the Amendments to the Massachusetts Constitution grants to the Commonwealth "[f]ull power and authority . . . to impose and levy a tax on income." " 'Income' . . . expresses a comprehensive idea. It is to be given a broad meaning." *Brown* v. *Commissioner of Corps. & Taxation*, 242 Mass. 242, 244 (1922). However, the term "income" "must be rationally construed and not stretched to include purely theoretical as distinguished from practical conceptions. Income as a subject of taxation imports an actual gain. It must mean an increase of wealth out of which money may be taken to satisfy the pecuniary imposition laid for the support of the government." *Id.*

DeLuca asserts that the portion of its income consisting of gains on the disposition of depreciated property for which no tax benefit inured to DeLuca is "fictional" or "paper" income. Based on this assertion, DeLuca concludes that the Massachusetts treatment of recaptured income violates art. 44. We disagree.

"It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals. Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation." *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359, 365 (1930). See *Hillsboro Nat'l Bank* v. *Commissioner of Internal Revenue*, 460 U.S. 370, 377 (1982), citing *Burnet* v. *Sanford & Brooks Co.*, *supra* ("[a]n annual accounting system is a practical necessity if the [F]ederal income tax is to produce revenue ascertainable and payable at regular intervals"); White, An Es-

say on the Conceptual Foundations of the Tax Benefit Rule, 82 Mich. L. Rev. 486, 490-491 (1983), and authorities cited. In *Burnet* v. *Sanford & Brooks Co.*, *supra*, a taxpayer reported net losses on a particular business contract for the 1913-1915 tax years. *Id.* at 361. In 1920, the taxpayer recovered significant income on the contract after obtaining a judgment against the United States government, its customer. *Id.* at 362. Although, over the course of the decade, the contract produced a net operating loss, the United States Supreme Court allowed the Commissioner to tax the 1920 recovery as if the losses in previous years had not occurred. *Id.* at 367. In 1920, taxpayers could not carry forward net operating losses (NOL) as they can today. *Id.* Cf. 26 U.S.C. § 172 (1998). The Court reasoned that the Legislature had to choose some regular method of assessing taxes, and, if transactional inequities flowed from the annual assessment of income taxes, relief could "be afforded only by legislation, not by the courts." *Burnet* v. *Sanford & Brooks Co.*, *supra* at 367.

DeLuca's claim also fails to account for the difference between inequities that arise out of the necessity of imposing an annual tax and the taxation of fictional gain. Taxation of fictional gain is prohibited by art. 44. See *Bryant* v. *Commissioner of Corps. & Taxation*, 291 Mass. 498, 501 (1935); *Brown* v. *Commissioner of Corps. & Taxation*, *supra*. Transactional inequities, by contrast, cannot practically be eliminated from the annual tax system.[15]

From a strict annual accounting perspective, there is no question that DeLuca realized an actual gain in 1989. DeLuca sold vehicles and received $8,282,105 in return. This was real income, which DeLuca could spend, as it chose, and which the Commonwealth could tax. We agree with the board that the situation here is distinguishable from that in cases cited by De-Luca. In *Weston Mktg. Corp.* v. *Commissioner of Revenue*, 40

---

[15]Although the tax benefit rule, recapture provisions, and adjustment to basis all represent attempts to bring the annual tax system more into line with transactional accounting, it is widely acknowledged that such corrections are inexact. See White, Realization, Recognition, Reconciliation, Rationality and the Structure of the Federal Income Tax System, 88 Mich. L. Rev. 2034, 2070 (1990); Willis, The Tax Benefit Rule, 42 Fla. L. Rev. 575, 593-595 (1990). For instance, recaptured income is taxed at the rate in effect when the income is recaptured, not at the rate in effect when the deduction was taken. See *id.* At best, and, in almost all cases, differences between a true transactional accounting and the accounting under the tax laws persist.

Mass. App. Ct. 1108 (1996), for example, the board granted an abatement of the taxpayer's taxes because the commissioner sought to tax fictional gains. The gains arose out of the treatment of certain futures contracts under the I.R.C. See 26 U.S.C. § 1256 (1998). In order to impose taxes on such contracts, the I.R.C. requires taxpayers to treat futures contracts as if they had been sold for "fair market value on the last business day" of the taxable year. *Weston Mktg. Corp.* v. *Commissioner of Revenue, supra.* The taxpayer, in 1981, held futures contracts which, had they been sold at fair market value on December 31, would have represented a loss of approximately $600,000. See *id.* As required, the taxpayer reported this loss on its Federal tax returns. See *id.* Massachusetts did not require such reporting. See *id.*

In 1982, the taxpayer Weston Marketing Corporation disposed of the futures contracts, reporting a net capital gain of over seven million dollars. See *id.* Under the I.R.C., the taxpayer was required to adjust the basis of the contracts to reflect the earlier loss deduction in 1981. See *id.* Massachusetts sought to require the taxpayer to adjust the basis of the futures contracts as well. See *id.* The board determined that the adjustment Massachusetts sought to impose "is not an actual realization of income, but a fictitious transaction deemed to have taken place for tax purposes." *Id.* On this basis, the board granted the abatement.

The adjustment the commissioner sought in *Weston Mktg. Corp.* v. *Commissioner of Revenue, supra,* represented a mere paper gain for two reasons. First, it involved an imaginary transaction that was deemed to have taken place for the sole purpose of assessing taxes. Second, the adjustment compensated for a loss that the taxpayer was required to report under the Federal Code, but which could not be reported under Massachusetts law. See T.H.E. Inv. Corp. *vs.* Commissioner of Revenue, Mass. App. Tax Bd. No. 132408 (Dec. 19, 1986). In the instant case, on the other hand, taxes were assessed on an actual transaction which increased DeLuca's wealth by some $8 million. The State Legislature chose to align itself with Federal tax law insofar as adjustments to the basis of the vehicles and the computation of recaptured income, both of which align the State's tax system more closely with a transactional accounting

system.[16] Thus, the underlying deduction and adjustment scheme were the same under Massachusetts and Federal law.[17] Because of this legislative choice, DeLuca was able to reduce the amount of its 1989 gains subject to the excise tax by approximately $5 million. The remaining portion of those gains was "an increase of wealth out of which money may be taken to satisfy the pecuniary imposition laid for the support of the government." *Brown* v. *Commissioner of Corps. & Taxation*, 242 Mass. 242, 244 (1922). The tax on that portion of the gains does not violate the Massachusetts Constitution.

5. *Conclusion.* The Massachusetts Legislature has consistently chosen to treat excess deductions from a previous tax year in a different manner from the I.R.C.. Although the I.R.C. allows the carry forward of NOLs for fifteen years, and the carry back of NOLs for five years, Massachusetts law in 1989 allowed neither carry forwards nor carry backs.[18]

These statutes evince a persistent and conscious legislative decision to take a different path from that of the Federal government in ameliorating the transactional inequities that arise from annual taxation. The board's decision affirming the denial of DeLuca's application for abatement was based on "substantial evidence and on a correct application of the law." *Koch* v. *Commissioner of Revenue*, 416 Mass. 540, 555 (1993). Relief for taxpayers in the same situation as DeLuca may "be afforded only by legislation, not by the courts." *Burnet* v. *Sanford & Brooks Co., supra* at 367.

*Decision of the Appellate Tax Board affirmed.*

---

[16]See G. L. c. 63, § 30 (1988 ed.) (requiring taxpayers to use the same depreciation method on their State tax returns as on their Federal tax returns and requiring taxpayers to compute their income based on the Federal provisions). See also White, Realization, Recognition, Reconciliation, Rationality and the Structure of the Federal Income Tax System, 88 Mich. L. Rev. 2034, 2055-2068 (1990) (explaining that the recapture provision works to "correct," albeit imperfectly, the effects of the annual accounting system). It is for the Legislature, not this court, to decide to bring the State treatment of NOL carryovers more in line with that of the Federal government.

[17]This was the basis on which the board rested its distinction between its previous rulings and its treatment of DeLuca's application for abatement.

[18]See note 8, *supra.*