CITY OF BOSTON *vs.* OUTDOOR ADVERTISING BOARD & others.[1]

No. 95-P-588.

Suffolk. September 24, 1996. - December 11, 1996.

Present: DREBEN, GILLERMAN, & FLANNERY, JJ.

*Outdoor Advertising Board. Advertising. Billboard. Sign.*

Discussion of G. L. c. 93D, and regulations pursuant thereto adopted by the Outdoor Advertising Board, regulating outdoor advertising, including billboards, near State highways, and the agreement thereunder entered into by the Department of Highways of the Commonwealth and the United States Secretary of Transportation. [776-778]

In an action challenging a decision of the Outdoor Advertising Board approving permit applications to erect two billboards, the record of an administrative proceeding demonstrated that the board failed to consider and act upon a substantive issue raised under G. L. c. 93D, with respect to whether the billboards were properly spaced and with respect to how the spacing was to be measured: the matters were remanded for resolution by the hearing officer. [778-783]

Substantial evidence supported the conclusion of the Outdoor Advertising Board that Morrissey Boulevard in Boston is neither a public park nor a reservation for purposes of G. L. c. 93D and agreements and regulations thereunder, which govern the placement of billboards near highways and parks. [783-784]

CIVIL ACTION commenced in the Superior Court Department on July 23, 1993.

The case was heard by *Margot Botsford, J.*

*John R. Deveraux,* Assistant Corporation Counsel, for the City of Boston.

*Pierce O. Cray,* Assistant Attorney General, for the Outdoor Advertising Board & others.

[1]Barton K. Hyte, Ernest Penta, and John Cirame, in their respective capacities as members of the Outdoor Advertising Board. In addition, Rite Media, Inc., was allowed to intervene as a matter of right as a party defendant.

*David G. LeFrancois* for Rite Media, Inc., intervener.

GILLERMAN, J. After three days of hearings before a hearing officer, and upon the recommendations of the hearing officer, the Outdoor Advertising Board (board), on June 2, 1993, approved permit applications submitted by the intervener, Rite Media, Inc. (Media), under G. L. c. 93D, § 3,[2] to erect a billboard at each of two sites in Boston — 100 Tenean Street and 650-700 Morrissey Boulevard.[3] Both locations are adjacent to the Southeast Expressway, an interstate highway.

On the appeal by the city of Boston (city), a judge of the Superior Court, proceeding under G. L. c. 30A, § 14, affirmed the decision of the board, and the city appealed from the final judgment claiming error in the administrative process. As required by G. L. c. 30A, § 14(5), our review is confined to the administrative record.

1. *The statutory and administrative structure.* General Laws c. 93D, § 2, as inserted by St. 1971, c. 1070, § 1, prohibits outdoor advertising "within six hundred and sixty feet of the nearest edge of the right-of-way . . . of a highway in the interstate or primary systems except . . . (*d*) Signs, displays and devices which are located in areas which are zoned industrial or commercial under authority of law and which have permits issued under the provisions of section three."

Section three of c. 93D, as amended by St. 1977, c. 530, § 5, states that the board "is authorized to issue permits for the erection and maintenance of signs, displays and devices described in clause[ ] . . . (*d*) of section two," (quoted above) provided that the erection and maintenance of such signs comply with agreements between the Department of Highways (DH)[4] and the United States Secretary of Transportation as authorized by G. L. c. 93D, § 7.[5] Section three also

---

[2]Chapter 93D regulates outdoor advertising signs which are adjacent to highways. The relevant provisions of that chapter are recited and discussed in the text, *infra.*

[3]Applications for additional sites were submitted to the board, but they are not involved in this appeal, and we make no further mention of them.

[4]Formerly, the Department of Public Works. See St. 1991, c. 552, §§ 6, 7, 80.

[5]Section 7, so far as material, authorizes agreements between the DH and the United States Secretary of Transportation to establish standards, inter alia, for the "spacing of signs" described in subsection (*d*) of § 2.

provides that no permit is required for signs described in clauses (*b*) and (*c*) of § 2 (signs advertising activity conducted on the property on which the sign is located and signs advertising the sale or lease of property upon which the sign is located — so-called "on-premises" signs).

The agreement between the DH and the Secretary of Transportation (the agreement)[6] states that its purposes are, inter alia, to "determine the size, lighting and spacing of signs . . . which may be erected . . . within 660 feet of the nearest edge of the right-of-way [of interstate highways located] within areas zoned industrial or commercial . . . [and] to promote the safety and recreational value of public travel and to preserve natural beauty." A "sign" is defined in the agreement to mean "any outdoor sign . . . which is visible from any place on the main-traveled way of an Interstate . . . highway."

With regard to the space *between* signs on interstate highways, see note 5, *supra,* the agreement provides that "[s]pacing between signs along each side of the highway shall be a minimum of 500 feet." We shall refer to this requirement as the "spacing requirement." There is no provision in the agreement which describes how the distance between signs is to be measured; we discuss this difficulty below.

A further limitation imposed by the agreement is that signs "may not be located within 300 feet of State or other public parks, playgrounds, forests, reservations, and scenic areas designated as such by the Department [of Highways]."[7] We shall refer to this requirement as the "park requirement."

Where a question arises as to whether a proposed sign complies with c. 93D and the agreement, a certification by the DH that a proposed billboard conforms to G. L. c. 93D

---

[6]The agreement is captioned, "Agreement For Carrying out National Policy Relative to Control of Outdoor Advertising in Areas Adjacent to the National System of Interstate . . . Highways . . . ." Section 131(*d*) of 23 U.S.C. (1994), authorizes the agreement referred to in the text.

[7]The board's regulations provide that no permit shall be granted for a billboard which is "within 500 feet of a public park or reservation if within view at any time of year of any portion of the same." 711 Code Mass. Regs. § 3.12(6)(1988). We need not comment on the apparent inconsistency between the agreement and the regulation for, as we state below, nothing at issue in these proceedings turns on the distance from a park.

"shall constitute a rebuttable presumption of the matter[ ] certified." 711 Code Mass. Regs. § 3.07(3)(1988).[8]

2. *The spacing requirement as applied to Tenean Street.* As noted above, G. L. c. 93D, § 3, provides that the board may issue billboard permits for off-premises signs provided that there is compliance with the spacing requirement. The application of the intervener, Media, included the certification of the DH, dated June 11, 1989, that the proposed sign was in conformity with c. 93D.

The administrative record includes the outdoor advertising inspection report of Inspector Regan, also dated June 11, 1989. In response to the question appearing on the report — "How many feet to nearest billboard (distance)" — no information was provided by Inspector Regan. At the bottom of the form appears the statement "Conforms to 93D." Media's application was accompanied by the certificate of Robert H. Johnson, the DH chief engineer, dated June 11, 1989, in which he states that the proposed sign is "in conformity with the provisions of Chapter 93D of the General Laws." The certificate is silent as to the spacing requirement.

At the hearing before the hearing officer, Edmund Pantalone testified. He stated that he was an inspector for the "Outdoor Advertising Agency." On cross-examination by the city, he testified, without objection, that the outdoor sign on top of the J. Freeman building, north of the proposed sign, was "[b]etween 300 and 400 feet" from the proposed Media sign. The plan of the area, which is in the appendix to the brief, shows a "J. Freeman, Inc." building northwest of the proposed sign; it appears from markers on the plan (there is no scale on the copy in the appendix) that the building is within 500 feet of the Southeast Expressway.[9]

The hearing officer's recommended decision to approve the

---

[8]General Laws c. 93, § 29, as inserted by St. 1955, c. 584, § 4, authorized the board to "make . . . rules and regulations for the proper control and restriction of billboards, signs and other advertising devices . . . on public ways or on private property within public view of any highway, public park or reservation."

[9]Our discussion of the testimony of Pantalone, and the plan which accompanied the application of Media, assumes that the appropriate method of measurement is along a straight line between the existing sign and the proposed sign. We discuss this assumption in more detail *infra.* What is important here is that the hearing officer never addressed the issue of the spacing requirement.

application did not discuss the absence of any material measurements in Inspector Regan's report, nor did it discuss the agreement or the effect of Pantalone's testimony — admitted without objection — which, if credited, would appear to establish a violation of the spacing requirement under the agreement. The decision of the board adopted in full the findings, conclusions, and recommendations of the hearing officer.

The judge in the Superior Court noted that the parties were in disagreement regarding the interpretation of the agreement — Media and the board arguing that the agreement only regulates the distance between off-premises signs, while the city argued that the agreement regulates the distance between any signs and that the proposed sign was within the prohibited 500 feet zone from an on-premises sign. The judge, without deciding this dispute, concluded that regardless of which signs were covered, the spacing requirement under the agreement required that the distance between signs be measured "along each side of the highway," and the city had failed to present evidence of such a measurement. In these circumstances, the judge held, the board was entitled to rely on the DH certification of conformity with the requirements of c. 93D.[10]

In our view, (i) the failure of Inspector Regan to record his measurement of the distance from the proposed sign to the "nearest billboard," taken together with (ii) the plan of the area, and (iii) the testimony of Pantalone — which the hearing officer did not discredit — that the distance between the proposed sign and the sign on top of the J. Freeman building was 300 feet to 400 feet (both signs being within the regulated zone of 660 feet), rebutted the presumption of the certification of compliance. See Liacos, Massachusetts Evidence § 5.8.5, at 235 (6th ed. 1994).

The issue whether the proposed sign would violate the spacing requirement must be resolved by the hearing officer, and we must remand the case for that purpose. The hearing officer must determine both *how* the distance between two signs is to be measured and the actual measurement between

---

[10]The judge also rested her decision on Pantalone's testimony that the proposed sign complied with c. 93D and the agreement, but there was no discussion of Pantalone's testimony regarding the 300-400 foot distance between signs.

the proposed sign and the nearest existing outdoor sign visible from the highway. Resolution of these issues in the first instance requires the exercise of the board's expertise to assure obedience to the high purposes of the agreement[11] (to promote both safety and the natural beauty of areas surrounding interstate highways), see G. L. c. 30A, § 14, as inserted by St. 1973, c. 1114, § 3 (court shall give "due weight to the experience, technical competence, and specialized knowledge of the agency"). The board's decision will be given some deference. See *Koch* v. *Commissioner of Rev.*, 416 Mass. 540, 555 (1993) ("In reviewing mixed questions of fact and law, the [appellate tax] board's expertise in tax matters must be recognized, and its decisions are due 'some deference'"). As to the distance measured, the decision of the board will not be reversed or modified if it is based on substantial evidence, see *ibid*.; Cella, Administrative Law and Practice § 1638, at 163 (1986), an element that is plainly lacking in this case.

In connection with *how* the distances are to be measured — to be decided in the first instance by the board — we offer these observations. The clause of the agreement requiring "spacing between signs along each side of the highway" to be not less that 500 feet contains a critical ambiguity: is the phrase "along each side of the highway" meant to modify "signs" (that is, the draftsman may have intended to refer to any sign which is within the regulated zone of 660 feet, and the measurement to be taken is along the direct line between the proposed sign and the nearest existing outdoor sign visible from the highway), or was the phrase meant to modify "spacing" (that is, the draftsman may have intended to look only to what a traveler on the highway would likely see "along each side" of the highway), and the measurement in

---

[11]The Federal Department of Transportation is content to leave the resolution of these issues to local authorities. Section 750.706 of Title 23 of the Code of Federal Regulations (1996) under the highway act state: "The State by law or regulation shall, in conformity with its agreement with the Secretary, set criteria for . . . spacing of outdoor advertising signs." Alternatively, under the terms of the agreement, the board may look to the local zoning authority for a determination of "customary use . . . as to . . . spacing . . . . "

that event, which we set out in the margin, would be more complex.[12]

We decline to choose among these alternatives; indeed, there may be additional approaches which are equally rational. The choice must be made by the board, selecting that method of measurement which, in the judgment of the board, is most likely to carry out the purposes of the Federal-Aid Highway Act of 1958. Moreover, the board may decide that a proposed sign is required to pass more than one test to be acceptable.

We also conclude, contrary to the argument of Media and the board, that the signs to be measured are both on-premises and off-premises signs. While § 2 does distinguish between on-premises and off-premises signs, and § 3, as we noted earlier, is expressly made inapplicable to on-premises signs,[13] the distinction made by § 3 is only for the purpose of determining the availability of permits issuable thereunder. No such distinction is made in the spacing clause, or in the definition of a "sign" under the agreement which the board is obliged to enforce when issuing § 3 permits.[14]

We return to the administrative record. While Pantalone's

[12]A Federal regulation promulgated under § 12 of the Federal-Aid Highway Act of 1958, Pub. L. No. 85-381, 72 Stat. 95, states, in regard to the measurement of distances, "Distance from the edge of a right-of-way shall be measured horizontally along a line normal or perpendicular to the centerline of the highway." 23 CFR § 750.103 (1996). If this procedure is followed, two (or more) lines perpendicular to the centerline of the highway would be drawn, one to the proposed sign, and one (or more) lines to outdoor signs near to the proposed sign. The distance between signs could then be measured along the highway (i.e., from the starting point, on the highway, of each of the perpendicular lines).

An alternative would be to follow the methodology set forth in the regulation regarding the calculation of the 660 feet of regulated space for outdoor signs: you proceed from the sign to "the *nearest* edge of the right-of-way adjacent to" the interstate (emphasis added). See 23 CFR § 750.706 (1996). The distance between signs would then be the distance, along the highway, between the points thus drawn on the edge of the right-of-way.

[13]Section 3 provides that, "[n]othing in this section shall apply to signs . . . referred to in clauses (*b*) and (*c*) [relating only to on-premises signs] of section two."

[14]As noted in the text, the form of inspection report of the board calls for an answer to the question, "How many feet to nearest billboard (distance)." No distinction is made by the board between on-premises and off-premises signs. This is a strong suggestion that the board's interpretation of § 3 is the same as that which appears in the text, and the board's interpretation is

testimony would appear to have rebutted the certification of the DH as to conformance to c. 93D, the question of the spacing requirement, and the effect to be given to Pantalone's testimony, were left unresolved. The hearing officer makes no mention of the issue[15] although the relevant testimony (albeit to a limited extent) was elicited on cross-examination and the issue regarding the spacing requirement was clearly identified to the hearing officer by the city's letter dated December 14, 1992. The issue was briefed again in the Superior Court.[16] The result is that a substantive issue was overlooked by the hearing officer, and left uncorrected by the board.

In sum, the city, as the appealing party, has the burden to demonstrate the invalidity of the administrative determination, *Merisme* v. *Board of Appeals of Motor Vehicle Liab. Policies & Bonds,* 27 Mass. App. Ct. 470, 474 (1989), and here it has established that the decision of the board, which adopted in full the recommendations of the hearing officer, must be set aside as to Tenean Street because of error of law — the failure to consider and act upon a substantive issue put forward by a party to the proceedings. See G. L. c. 30A, § 11(8) (agency decision must include a determination of each issue of fact and law necessary to the decision).

3. *The spacing requirement as applied to Morrissey Boulevard.* For similar reasons, we reach the same conclusion regarding the spacing requirement as applied to the proposed sign on Morrissey Boulevard. Joseph B. Chaisson, a resident of the area and an officer of various neighborhood associations, testified that other signs, visible from the Southeast Expressway, were within 500 feet of the proposed sign. Pantalone also testified that another on-premises sign was within 500 feet of the proposed sign.

The DH certified the application as being in conformity with c. 93D on July 3, 1989, and Regan's inspection report dated June 26, 1989, states that the distance to the nearest billboard was "more than 500 feet." However, Pantalone's

entitled to our consideration. See *Board of Educ.* v. *Assessor of Worcester,* 368 Mass. 511, 515 (1975).

[15]The recommended decision of the hearing officer recited that DH certified the applications were in conformity with G. L. c. 93D, but the decision made no mention of the dispute about the spacing requirements.

[16]The board's argument that the issue has been waived by the city is plainly wrong.

inspection report dated September 12, 1989, recites that an on-premises sign is within 500 feet of the proposed sign, and he so testified. Again, the hearing officer's recommended decision recites the DH certification but makes no mention of the spacing requirement under the agreement which was, as we have seen, a live issue in the case.

The judge concluded that the hearing officer was entitled to rely on the DH certification. While we agree with the judge as to the "murkiness of the record," we do not agree that the DH certification is sufficient to carry the day for Media. Based on the testimony of Chaisson and Pantalone, as well as the inspection report of Pantalone, the DH certification was effectively rebutted. The critical issue of the spacing requirement, which was raised before the hearing officer, should have been dealt with by the hearing officer and the board. The decision of the board, which merely adopted in full the findings and conclusions of the hearing officer, is defective as matter of law. See G. L. c. 30A, § 11(8).

4. *The park status of Morrissey Boulevard — the park requirement.* It is not disputed that the proposed sign would be within 300 feet of Morrissey Boulevard, including the grass slope embankments of the Southeast Expressway between Morrissey Boulevard and the roadway of the Southeast Expressway. If, as the city claims, Morrissey Boulevard falls within the definition of a "public park" under Federal[17] or State law,[18] the proposed sign may not be erected and the permit would have been wrongfully issued.

The city's principal witness, Julia O'Brien, director of planning for the Metropolitan District Commission (MDC), testified that Morrissey Boulevard has been designated a metro-

[17]The agreement provides that signs may not be erected within 300 feet of public parks, playgrounds, forests, reservations and scenic areas designated as such by the DH or by any State agency having and exercising the authority to so designate.

[18]Section 3.12(6) of 711 Code Mass. Regs. (1988) provides that no permit shall be granted for a sign which is within *500* feet of a public park or reservation if within view at any time of the year. Section 3.01 of 711 Code Mass. Regs. (1988) defines public park or reservation as any park, reservation, playground, cemetery or other land, regardless of ownership, which is available for public use or reserved for the public, for recreation or conservation purposes. We need not discuss whether the more restrictive 300 feet limit imposed by the agreement displaces the State regulations, for we decide the case on other grounds.

politan parkway; that is, "a roadway that links to the various parks of our park system." The purpose of an MDC parkway is "pleasure driving," O'Brien said. O'Brien also conceded that commercial activity exists on both sides of Morrissey Boulevard in the area at issue.

There was also evidence that a DH inspector, after viewing the site, concluded that Morrissey Boulevard was not a park within the regulatory definition of that term. We agree with the judge; there was substantial evidence, under applicable Federal and State standards, that Morrissey Boulevard is neither a public park nor a reservation reserved for recreation or conservation purposes, nor is it a scenic area designated by the DH. The board's decision on this issue must be affirmed. See *Flint* v. *Commissioner of Pub. Welfare,* 412 Mass. 416, 420 (1992) ("The standard of review is highly deferential to the agency on questions of fact and reasonable inferences drawn therefrom").

This case is remanded to the Superior Court for further proceedings before the board consistent with this opinion, including detailed findings of fact and conclusions of law, regarding the spacing requirements for both the Tenean Street and the Morrissey Boulevard permit applications.

*So ordered.*