BOSTON PROFESSIONAL HOCKEY ASSOCIATION, INC. *vs.*
COMMISSIONER OF REVENUE (and a consolidated case[1]).

Suffolk. October 6, 2004. - January 13, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Taxation,* Corporate excise, Commissioner of revenue, Appellate Tax Board:
Appeal to Supreme Judicial Court. *Commissioner of Revenue.*

The Appellate Tax Board (board) correctly ruled that one hundred percent of
the revenue that the corporate taxpayer received from the sale of tickets to
its professional hockey team's games was properly apportioned to Mas-
sachusetts, rejecting the taxpayer's argument that the costs of the team's
home and away games should be individually analyzed to effectively
reduce the total sales of the corporation deemed to be in Massachusetts
[281-288]; likewise, the board correctly included revenues from the licens-
ing of local broadcast rights in the taxpayer's sales, given the taxpayer's
failure to overcome the regulatory presumption that the licensees used the
licenses in Massachusetts, the State in which all of the licensees were com-
mercially domiciled [288-290].
The Appellate Tax Board (board) erred in affirming the determination of the
Commissioner of Revenue (commissioner) apportioning to Massachusetts
revenue that the corporate taxpayer, the owner of a professional sports
team, received from the licensing of national and international broadcast
rights to the team's games, as well as the licensing of team logos and
trademarks, in determining the taxpayer's liability for corporate excise
taxes, where the commissioner did not meet his burden, imposed by regula-
tion, of producing evidence to demonstrate that a greater proportion of the
use of the licenses occurred in or was geographically associated with Mas-
sachusetts, rather than any other one State [290-291]; moreover, although
the board properly affirmed the commissioner's apportionment to Mas-
sachusetts of the taxpayer's entire pro rata share of income received from
advertisers who purchased advertising placements from a cable television
network in which the taxpayer retained a limited partnership interest, the
board erred in affirming the commissioner's apportionment of revenue
derived from out-of-State affiliate licensing agreements to Massachusetts,
where there was no evidence in the record on which to base a finding that
the majority of subscribers of any such affiliate resided in Massachusetts
rather than another State [291-293].
The Appellate Tax Board correctly excluded from the apportionment formula
used to calculate the taxpayer's corporate excise taxes the taxpayer's pro
rata share of the capitalized value of the fees that a cable television network

[1]Jeremy M. Jacobs & another *vs.* Commissioner of Revenue.

in which the taxpayer retained a limited partnership interest paid, under an agreement with a separate company that owned certain satellites, for the use of satellite transponders to transmit the cable television network's signal, where the agreement was a service contract, not a rental agreement which would have been relevant to the calculation of the taxpayer's corporate excise taxes under G. L. c. 63, § 38 (*d*). [293-296]

This court concluded that the Commissioner of Revenue's interpretation and application of the apportionment formula used to calculate the taxpayer's corporate excise tax did not violate the commerce clause of the United States Constitution, despite the erroneous apportionment of certain income to Massachusetts, where the taxpayer did not sustain its burden of proving by clear and cogent evidence that, as to the properly apportioned revenues, the application of the formula operated to reach profits which were in no just sense attributable to the taxpayer's transactions within Massachusetts. [296-298]

APPEAL from a decision of the Appellate Tax Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John Kenneth Felter* (*Daniel M. Forman* with him) for the taxpayers.

*Pierce O. Cray*, Assistant Attorney General (*Thomas W. Hammond* with him) for Commissioner of Revenue.

CORDY, J. This is an appeal from a decision of the Appellate Tax Board (board) affirming the denial by the Commissioner of Revenue (commissioner) of applications by the taxpayers, the Boston Professional Hockey Association, Inc. (BPHA), and Jeremy M. and Margaret J. Jacobs (Jacobses), for the abatement of taxes assessed for the tax years 1991, 1992, 1993, and 1994. They contend that the board erred in ruling that one hundred per cent of the revenue BPHA received from the following sources was properly apportioned to Massachusetts: the sale of tickets to Boston Bruins hockey games (gate receipts); the licensing of local, national, and international broadcast rights; the licensing of logos and trademarks; and a limited partnership interest in the New England Sports Network, L.P. (NESN).[2] The appellants also claim that the board erred in excluding from the apportionment formula used to calculate BPHA's corporate excise taxes, BPHA's pro rata share of the value of the satellite

[2]NESN, a Massachusetts limited partnership, produces sports television programming for the cable television industry.

transponders that NESN used to transmit its signal. See G. L. c. 63, § 38 (*c*). We transferred the appeal to this court on our own motion, and now affirm the board's decision in part, and reverse it in part.[3]

1. a. *Background.* BPHA is a Massachusetts domestic Subchapter S corporation with a principal place of business in Boston. It owns and operates the Boston Bruins professional hockey club (Bruins). BPHA is a member of the National Hockey League (NHL) and, as such, is governed by the NHL Constitution, bylaws, and resolutions. The NHL Constitution requires each member team to play a specific number of regular season games, approximately one-half of which must be played in opponents' home arenas. It also provides that each member team retains the revenues from gate receipts for home games only,[4] and "irrevocably" divests itself of any rights or interests in hockey games played in the "home territory" of another member team.[5] Art. 4.4 of the NHL Constitution.

During the tax years at issue, BPHA received the gate receipts for its home games (including the revenue from season ticket sales) and earned income from broadcast licensing agreements with the Boston Celtics Acquisitions Limited Partnership (owner

[3]The parties have agreed that the Jacobses' appeal will be resolved by our resolution of BPHA's appeal. Jeremy M. Jacobs, the sole shareholder of the BPHA, was not a resident of Massachusetts during the tax years at issue. He was subject to Massachusetts taxes only on his distributive share of the Massachusetts-apportioned income realized by BPHA during those years. G. L. c. 62, § 17A (*b*).

[4]During the tax years in question, the Bruins also played a number of preseason exhibition games, "neutral site games" (played outside any NHL team's home territory), and postseason playoff games. Revenues from preseason games were distributed according to two distinct financial arrangements: for "paired" games (which were played in the teams' home arenas), BPHA retained its home gate receipts; for "unpaired" games (which were sometimes played at alternative sites), compensation involved either a fixed fee paid to the visiting team or some other agreed-on arrangement. Gate receipts for neutral site games were divided between the two teams and the NHL. If the Bruins advanced to the playoffs, BPHA retained the gate receipts for its first two playoff home games in each series. Revenues from games five through seven (if necessary) were determined by a formula provided in the NHL's playoff rules.

[5]"Home territory" is defined in art. 4.1(c) of the NHL Constitution as "the city in which [the member team] is located and within fifty miles of that city's corporate limits."

and operator of radio station WEEI-AM), New Boston Television, Inc. (owner and operator of television station WSBK-TV), and NESN. As a limited partner in NESN, BPHA also received a pro rata share of NESN's profits. In addition, BPHA earned revenue from the NHL and NHL-related entities for the use of Bruins logos and trademarks and for national and international broadcasting rights.

BPHA timely filed Massachusetts tax returns for 1991, 1992, 1993, and 1994. In those returns, it did not treat all of the income received from these sources as Massachusetts income. Subsequently, the commissioner notified BPHA of his intent to assess additional corporate excise taxes against it for those years, plus interest. BPHA paid the adjusted assessments and timely filed applications for abatement. The commissioner denied the applications, after which BPHA petitioned the board for relief. The board affirmed the commissioner's rulings, concluding that BPHA failed to meet its burden of proving an entitlement to abatements. This appeal followed.[6]

b. *Corporate excise tax.* A brief review of the Massachusetts corporate excise tax is helpful in understanding the underlying dispute. Where a corporation such as BPHA conducts business both within and outside Massachusetts, the share of its taxable net income subject to corporate excise tax in Massachusetts is calculated by utilizing the so-called "statutory method" provided in G. L. c. 63, § 38. *Gillette Co.* v. *Commissioner of Revenue*, 425 Mass. 670, 673 (1997). "Taxable net income is determined by taking the corporation's Federal net income, as defined in G. L. c. 63, § 30 (5) (*b*), applying statutory deductions enumerated in G. L. c. 63, § 38 (*a*), and multiplying the result by the three-factor apportionment formula in G. L. c. 63, § 38 (*c*)."[7] *Id.* That formula is based on the ratio of the corporation's property, payroll, and sales in Massachusetts to its

[6]The Jacobses are similarly situated. They were assessed additional personal income taxes for the years 1991 to 1994 based on the commissioner's reapportionment of BPHA's income, paid the taxes plus interest, filed for abatements which were denied (on the same grounds they were denied to BPHA), and appealed.

[7]The purpose of applying this three-factor apportionment formula is to obtain a fair approximation of the corporate income that is "reasonably related to the activities conducted within [Massachusetts]." *Gillette Co.* v.

total property, payroll, and sales everywhere. More specifically, it is "a fraction, the numerator of which is the property factor plus the payroll factor plus twice the sales factor, and the denominator of which is four." G. L. c. 63, § 38 (*c*). The property, payroll, and sales factors are in themselves fractions. *Gillette Co.* v. *Commissioner of Revenue, supra.* The numerator of the property factor "is the average value of the corporation's real and tangible personal property owned or rented and used in" Massachusetts. G. L. c. 63, § 38 (*d*). The denominator "is the average value of all the corporation's real and tangible personal property owned or rented and used during the taxable year." *Id.* The numerator of the payroll factor is the total amount of compensation paid by the corporation in Massachusetts. The denominator is the total amount of compensation paid "everywhere" during the tax year. *Id.* at § 38 (*e*). Similarly, the numerator of the sales factor "is the total sales of the corporation in this commonwealth during the taxable year," while the denominator "is the total sales of the corporation everywhere during the taxable year." *Id.* at § 38 (*f*).

The Department of Revenue (department) promulgated detailed regulations implementing the corporate excise tax and its apportionment formula in 1995, and amended them in 1999. 830 Code Mass. Regs. § 63.38.1 (1999). Although the board's decision makes reference to both the original and the amended regulations, the parties agree that the 1995 version of the regulations, and not the amended regulations, should apply to the present matter.[8]

On appeal, BPHA challenges the commissioner's computation of BPHA's sales and property factors under the statute and its implementing regulations, and seeks to reduce the amount of each factor thereby reducing the percentage of net income subject to the Massachusetts excise tax. BPHA also contends that the commissioner's interpretation and application of the ap-

*Commissioner of Revenue*, 425 Mass. 670, 681 (1997), quoting *Exxon Corp.* v. *Department of Revenue of Wisc.*, 447 U.S. 207, 223 (1980).

[8]The "Effective Date" provision of the 1995 version of the regulations states that taxpayers may elect to apply 830 Code Mass. Regs. § 63.38.1 to tax years ending before 1995. 830 Code Mass. Regs. § 63.38.1(13) (1995). This provision also states that the commissioner "may assert positions not inconsistent with" § 63.38.1 to pre-1995 tax years. *Id.*

portionment formula violates the commerce clause of the United States Constitution. We address each of these arguments in turn.

2. *Sales factor.* In its sales factor claim, BPHA seeks to lower the amount of the numerator by reducing the total sales of the corporation deemed tó be "in this commonwealth." Specifically, BPHA maintains that the board erred in: (1) including in the numerator of BPHA's sales factor the entirety of BPHA's gate receipts, licensing fees, and pro rata share of NESN partnership income.

General Laws c. 63, § 38 (*f*), provides that:

> "Sales, other than sales of tangible personal property, are in this commonwealth if:
>
> "1. the income-producing activity is performed in this commonwealth; or
>
> "2. the income-producing activity is performed both in and outside this commonwealth and a greater proportion of this income-producing activity is performed in this commonwealth than in any other state, based on costs of performance."[9]

The department's regulations elaborate further the meaning and proper application of this statutory provision by first articulating a general rule that fleshes out § 38 (*f*) in several respects:

> "1. *General Rule.* Gross receipts from sales, other than sales of tangible personal property, are attributed to Massachusetts if the income-producing activity that gave rise to the receipts was performed wholly within Massachusetts. If income-producing activity is performed both within and without Massachusetts and if the costs of performing the income-producing activity are greater in Massachusetts than in any other one state, gross receipts are attributed to Massachusetts."

830 Code Mass. Regs. § 63.38.1(9)(d)(1). The regulations then define "[i]ncome-producing [a]ctivity" as:

---

[9] "Cost of performance" is defined in the regulations as "direct costs determined in a manner consistent with generally accepted accounting principles." 830 Code Mass. Regs. § 63.38.1(9)(d)(4).

> "[A] transaction, procedure, or operation directly engaged in by a taxpayer which results in a separately identifiable item of income. In general, any activity whose performance creates an obligation of a particular customer to pay a specific consideration to the taxpayer is an income-producing activity. However, except insofar as required by 830 [Code Mass. Regs. §] 63.38.1(9)(d)3.c., (relating to the licensing or sale of intangibles), income producing activity includes only the activities of the taxpayer whose income is being apportioned."

*Id.* at § 63.38.1(9)(d)(2). Finally, the regulations establish specific rules for use in determining when gross receipts arising from different types of "income-producing activities" (occurring within and outside the Commonwealth) are properly apportioned to Massachusetts. *Id.* at § 63.38.1(9)(d)(3). Two of those specific rules are relevant here. The first relates to the "rendering of personal services" (such as the performance of athletic events), and the second relates to the "licensing or sale of intangible property" (such as broadcasting or trademark rights).

With respect to personal services, the regulations provide that:

> "Where personal services relating to an item of gross receipts are rendered partly within and partly without Massachusetts, the gross receipts for the performance of such services shall be attributed to Massachusetts if, based upon costs of performance, a greater proportion of the services was rendered in Massachusetts than in any other one state."

*Id.* at § 63.38.1(9)(d)(3)(a). This provision mirrors the general rule of apportioning income to Massachusetts unless the cost to the taxpayer of performing the income-producing activity in one other specific State (rather than in all other States combined) exceeds the cost incurred here.

With respect to the "licensing or sale" of intangible property, the regulations depart from a focus on where the taxpayer (licensor) conducts its activities and incurs its costs, and instead focuses on where the licensee "uses" the licensed property:

> "Gross receipts from the licensing . . . of intangible

property are attributable to Massachusetts if the property is used by the . . . licensee solely in Massachusetts. If the . . . licensee uses the intangible property in more than one state, the gross receipts from licensing . . . are attributable to Massachusetts if the use of property by the . . . licensee in Massachusetts exceeds its use of the property in any other one state."

*Id.* at § 63.38.1(9)(d)(3)(c).[10] To determine where the licensee "uses" the licensed property, the regulations establish a rebuttable presumption that such use occurs in the State of the licensee's commercial domicil "unless the taxpayer or the Commissioner demonstrates that the property is actually used in or geographically associated with another specific state, and that such actual use or association exceeds the use in or association with the state of commercial domicile." *Id.* at § 63.38.1(9)(d)(3)(c)(i).

With this framework, we turn to the apportionment of the specific items of income challenged by BPHA.

a. *BPHA's gate receipts.* BPHA contends that each Bruins game, both home and away, constitutes a separate "income-producing activity," the costs of which must be individually analyzed to determine whether any of the gate receipts should be allocated to Massachusetts. In the proceedings before the board, it produced expert testimony that the direct costs borne

---

[10]The 1999 amendments retain this language, but add the following sentences that now immediately precede it: "Where a taxpayer licenses intangible property to another party and receives royalties or similar payments for the use of the intangible property, income-producing activity includes the use of the intangible property by such other party. Each use of the intangible property that results in a separately identifiable item of income for the taxpayer shall be a separate income-producing activity and shall be considered a separate use of the intangible property for purposes of 830 Code Mass. Regs. [§] 63.38.1(9)(d). In the case of licenses or similar arrangements compensated by a percentage of the licensee's sales, each sale by the licensee that results in a payment to the licenser whether separate from or combined with other payments is an income producing activity." 830 Code Mass. Regs. § 63.38.1(d)(3)(c).

It is not apparent whether this added language retains the regulation's exclusive focus on the use of the license by the licensee, or whether it incorporates the taxpayer's "income producing activity" (or its costs) into the equation by which licensing revenue is apportioned. However, we need not rule on this point, as the parties agree that the 1995 version of the regulation applies.

by BPHA when the Bruins played an away game were incurred almost entirely in the State where the game was played (not in Massachusetts), and therefore the gate receipts received in connection with away games should not be attributed to Massachusetts. While BPHA acknowledges that it did not receive any cash for playing away games, it argues that the "performance" of the Bruins at each away game created an "obligation" on the part of the opposing team to play at the Bruins' home arena. That obligation, BPHA contends, constituted "consideration" for the purposes of 830 Code Mass. Regs. § 63.38.1(9)(d)(2) ("any activity whose performance creates an obligation of a particular customer to pay a specific consideration to the taxpayer is an income-producing activity"). Its expert further opined that the total gate receipts attributable to the Bruins' regular season away games should be calculated by dividing the total game revenue for the season by the total number of games, then multiplying the quotient by the total number of away games. The resulting figure, BPHA maintains, represents non-Massachusetts income and should have been excluded from the numerator of BPHA's sales factor.

The board rejected BPHA's argument on alternative grounds. First, it found that with respect to gate receipts received by BPHA, the "income-producing activity" was the "operation of an NHL franchise," not just the playing of individual games. That activity included many subsidiary activities (including the playing of games) necessary to create a viable NHL franchise, and the greatest portion of the costs incurred in that income-producing activity were incurred in Massachusetts where the franchise was physically located, administered and managed, and where the team played almost one-half of its games. Alternatively, it found that even if each game were treated as a separate income-producing activity, BPHA only received gate receipts when the Bruins played home games, and those receipts were received entirely in Massachusetts where the costs of playing the games were also incurred. In so finding, the board rejected BPHA's argument that BPHA earned consideration (and therefore revenue) in their performance of regular season

away games in the form of the obligation of the away team to play a corresponding game in BPHA's home territory.[11]

"The taxpayer has the burden of proving as a matter of law [its] right to an abatement of the tax." *Koch* v. *Commissioner of Revenue*, 416 Mass. 540, 556 (1993), quoting *M & T Charters, Inc.* v. *Commissioner of Revenue*, 404 Mass. 137, 140 (1989). Accord *Farrell Enters., Inc.* v. *Commissioner of Revenue*, 46 Mass. App. Ct. 564, 572 n.15 (1999). This obligation is not a light one, *General Elec. Co.* v. *Assessors of Lynn*, 393 Mass. 591, 599 (1984) ("taxpayer bears the burden of persuasion of every material fact"), and it is particularly heavy with respect to challenges to the apportionment of income under G. L. c. 63, § 38. Before this court will require the Commonwealth to adopt an alternative computation method, "the taxpayer must prove by 'clear and cogent evidence' that the income attributed to the Commonwealth is in fact 'out of all appropriate proportion to the business transacted' here or has 'led to a grossly distorted result.' " *Gillette Co.* v. *Commissioner of Revenue*, 425 Mass. 670, 679 (1997), quoting *W.R. Grace & Co.* v. *Commissioner of Revenue*, 378 Mass. 577, 591 (1979).

We will not modify or reverse a decision of the board if the decision is based on both substantial evidence and a correct application of the law. *Kennametal, Inc.* v. *Commissioner of Revenue*, 426 Mass. 39, 43 (1997), cert. denied, 523 U.S. 1059 (1998). Our review of the sufficiency of the evidence is limited to "whether a contrary conclusion is not merely a possible but a necessary inference from the findings." *Commissioner of Revenue* v. *Houghton Mifflin Co.*, 423 Mass. 42, 43 (1996), quoting *First Data Corp.* v. *State Tax Comm'n*, 371 Mass. 444, 446 (1976). "In reviewing mixed questions of fact and law, the board's expertise in tax matters must be recognized, and its decisions are due 'some deference.' " *Koch* v. *Commissioner of Revenue*, *supra* at 555, quoting *McCarthy* v. *Commissioner of Revenue*, 391 Mass. 630, 632 (1984).

---

[11]Although not necessary to its decision, the board also found that BPHA's expert had not fully accounted for all the direct costs incurred in the playing of away games. For example, the board found that the salaries of BPHA's Boston-based executive and administrative staff should have been included in the accounting of BPHA's expert.

We conclude that both grounds on which the board upheld the commissioner's allocation of gate receipts were based on reasonable interpretations of the tax laws and the department's regulations, were supported by substantial evidence, and do not lead to a "grossly distorted result." *W.R. Grace & Co.* v. *Commissioner of Revenue, supra* at 591, quoting *Moorman Mfg. Co.* v. *Bain,* 437 U.S. 267, 274 (1978).

The board's finding — that BPHA's income-producing activity was the operation of an NHL franchise rather than the playing of individual games — fits comfortably within the text of the regulation that states that "an income-producing activity is a transaction, procedure, or *operation* directly engaged in by a taxpayer which results in a separately identifiable item of income," in this case, gate receipts (emphasis added). 830 Code Mass. Regs. § 63.38.1(9)(d)(2). This construction of the regulation is neither "patently wrong, unreasonable, arbitrary, whimsical, or capricious." *Box Pond Ass'n* v. *Energy Facilities Siting Bd.,* 435 Mass. 408, 416 (2001), quoting *TBI, Inc.* v. *Board of Health of N. Andover,* 431 Mass. 9, 17 (2000).[12] Moreover, the evidence in the record amply supports the conclusion that, when viewed as a single "income-producing activity," the costs of fielding and managing the Bruins through the games in a tax year were borne largely in Massachusetts and, at a minimum, in greater proportion here than in any other State.[13]

With respect to the alternative ground of its decision, the board's rejection of BPHA's argument that game receipts should

[12] The board's construction of the relevant "income-producing activity" as the operation of the franchise resolves *all* of BPHA's "gate receipts" claims, including not just those relating to the regular season away games but also (1) those concerning the other away games that do not generate actual cash revenue for BPHA ("paired" preseason away games and the away games in the first four games of a Stanley Cup playoff series) and (2) those pertaining to the relatively few games played in other States that *do* generate actual cash revenue for the team (neutral-site regular season games, "unpaired" preseason away games, and away games in the fifth through seventh games of a playoff series).

[13] BPHA's operations, including its public and press relations departments, finance department, sales and marketing department, legal department, general manager, and administrative staff, were all located in Boston. BPHA's expert conceded that if the "income-producing activity" was found to be the playing of an entire season, rather than the playing of an individual game, some of the costs he categorized as "indirect costs" might in fact be "direct costs."

be attributed to away games because BPHA received consideration for those games, was also based on a reasonable interpretation and application of the department's regulations and on substantial evidence. BPHA's argument relies on the second sentence of 830 Code Mass. Regs. § 63.38.1(9)(d)(2), which explains "income-producing activity" as "any activity whose performance creates an *obligation of a particular customer to pay a specific consideration to the taxpayer*" (emphasis added). This reliance is misplaced. The ordinary meaning of the word "customer" is "a person who buys goods or services." American Heritage Dictionary 327 (1969). See *Hellman* v. *Board of Registration in Med.*, 404 Mass. 800, 803-804 (1989), and cases cited (regulatory interpretation, like statutory interpretation, requires giving each word plain meaning). An opposing NHL team is not a "customer" and does not pay the Bruins for their performance. Moreover, the evidence is that it is the NHL Constitution, rather than the Bruins' performance, that both creates an opposing team's obligation to play in the Bruins' home arena and divests member teams of any rights or interest in their away games. The Bruins do not have the right to compel an opposing team to appear and play in its home territory or to decline to appear and play an opponent who has failed to come to Boston. The NHL's Constitution deals with such behavior. That document expressly provides for the suspension or termination of NHL membership if a member fails "to present its team at the time or place provided by the schedule to play any League game, playoff game or championship game, unless caused by strikes, unavoidable accident in travel or by some other cause for which such member is not responsible." In other words, the obligation arises from the preexisting NHL Constitution, and not from the playing of any particular game. We have long held that "performance of an existing legal duty or contractual obligation is not sufficient consideration for a new promise by the obligee." *Sloan* v. *Burrows*, 357 Mass. 412, 415 (1970). See *Swartz* v. *Lieberman*, 323 Mass. 109, 112 (1948); *Parrot* v. *Mexican Cent. Ry.*, 207 Mass. 184, 194 (1911). On this record, the board reasonably found that the only gate receipts that BPHA was entitled to receive were received for performances in Massachusetts, where the costs of those activities were also

incurred. Consequently, all of the revenue was properly allocated to Massachusetts.

b. *BPHA's revenue from licensing local broadcast rights.* Under the NHL Constitution, BPHA owns the right to broadcast its away games to audiences in its home territory.[14] BPHA contends that the commissioner erred in including in the numerator of BPHA's sales factor one hundred per cent of the income BPHA received from licensing these broadcast rights to WEEI-AM, WSBK-TV, and NESN. Specifically, it objects to the inclusion of the license fees paid to broadcast away games on the theory that those licenses were "used" in States outside Massachusetts, and that the direct costs incurred by the licensees were largely incurred outside Massachusetts.

Before the board, BPHA argued that the 1999 amended regulations required a game-by-game analysis of "use," determined by measuring the licensee's direct costs. ("Each use of the intangible property [by a licensee] that results in a separately identifiable item of income for the taxpayer shall be a separate income-producing activity and shall be considered a separate use of the intangible property . . . ." 830 Code Mass. Regs. § 63.38.1[9][d][3][c] [1999].) The board, assuming arguendo that the 1999 regulations applied, nonetheless rejected BPHA's argument for two reasons. First, the board found that the income-producing activity of the broadcasters themselves included many costs that were incurred in Massachusetts, such as the salaries paid to staff members working in its Massachusetts production studios, and the actual cost of the licenses.[15] Second, the board found that BPHA failed to demonstrate that the direct costs attributable to any one State were greater than all the direct costs attributable to Massachusetts.[16] We examine the application of the 1995 regula-

[14]The Appendix to the NHL Constitution provides that "each Member Club may broadcast its away games on transmitters located in its own home territory and to that extent it has exclusive rights thereto for such limited purpose."

[15]There was evidence that the cost of the license for each away game exceeded the out-of-State costs incurred to broadcast it.

[16]The board also interpreted the 1999 amended regulation to permit the department to consider the taxpayer's cost in developing and maintaining an NHL franchise in determining the proper apportionment of licensing revenues,

tions that the parties agree should have governed, and affirm the commissioner's apportionment.

It is undisputed that the three licensees at issue here are commercially domiciled in Massachusetts. Consequently, the regulation provides that the BPHA licenses are "deemed" to have been used in Massachusetts absent a showing by the taxpayer that the licenses were "actually used" to a greater extent in, or were more "geographically associated" with, another State. 830 Code Mass. Regs. § 63.38.1(9)(d)(3)(c)(i). BPHA contends that this presumption of use in Massachusetts is rebutted because the "actual use" of the license occurs where the licensee incurs the majority of the direct costs of each of its broadcasts. With respect to away games, those costs are incurred in the States from which the games are broadcast, and not in the States (principally Massachusetts) where the games are viewed by audiences. The commissioner, on the other hand, argues that with respect to license revenues, the regulation does not focus on where the "costs" of production are incurred, but on where the licensee "uses" the license, and that "actual use" occurs "where the broadcast is 'displayed' to its viewers and generates advertising revenue."[17]

Neither of the terms "actual use" or "geographically associated" is defined in the regulation, but "examples" of each are provided. Examples of "actual use" include "the use of patents or trade secrets in a manufacturing process, the physical reproduction of copyrighted material, or the advertisement or retail display of a trademark or trade name." 830 Code Mass. Regs. § 63.38.1(9)(d)(3)(c)(i). "Examples of geographic association with a specific state include marketing rights, rights under a covenant not to compete, or broadcast rights, if such rights are restricted to a specific geographic area." *Id.*

In the circumstances of this case, the commissioner's

---

"because, without a viable franchise, BPHA would have had nothing to license to the broadcasters." *See* note 10, *supra. Because* we apply the 1995 regulations, we do not decide the correctness of this interpretation.

[17]The commissioner also argues that the board correctly determined that the direct costs of using a license to broadcast an away game must include costs not considered by BPHA's expert, such as the cost of the license itself. Once all such costs are added in, the commissioner contends that the licensee's direct costs for each game are greater in Massachusetts.

interpretation and application of the regulation are reasonable. Under the examples of "actual use" set forth in the regulation, the "use" of a trademark license would occur where the trademark was displayed to the public and generated retail revenue. The use of the broadcast licenses at issue here similarly can be understood properly to have occurred where the broadcast was displayed and advertising revenues generated. In addition, the rights licensed were rights to broadcast Bruin games to audiences in BPHA's home territory, a clear geographic association with Massachusetts, and not with the States where the away games were played. BPHA's argument — that the general rule governing the taxpayer's income-producing activity focuses on costs of performance, 830 Code Mass. Regs. § 63.38.1(9)(d)(1), and thus the licensee's "actual use" must also be defined in terms of its cost of performance — is unpersuasive given the markedly different language employed by the regulation with regard to allocating revenue earned from licensing agreements. See *Doe* v. *Attorney Gen.*, 425 Mass. 210, 215 (1997) (when two statutory provisions conflict, more specific applies over general rule). In sum, we conclude that BPHA has not overcome the regulatory presumption that their licensees "used" the licenses in Massachusetts, the State in which all were commercially domiciled.

    c. *BPHA's revenue from licensing national and international broadcast rights, and Bruins trademarks and logos, to the NHL.* In 1984, each member team of the NHL entered into an agreement that granted national and international broadcast rights to the NHL.[18] In return, each member team received a share of the revenues generated by the NHL broadcast license.[19] During some of the tax years in question, BPHA also received license fees from NHL Services, Inc.; NHLS of Canada Ltd.; and the NHL for the use of Bruins logos and trademarks. It is undisputed that none of these licensees maintained a commercial domicil in

---

[18]Specifically, each member team agreed to "provide to the [NHL] such rights as are necessary for the full implementation of the 1984-85 U.S.A. non-local broadcast agreement, any future non-local broadcast agreement in the U.S. and any Canadian pay-cable agreement."

[19]During the tax years at issue, and as authorized by the agreement, the NHL sublicensed its rights to national and international broadcasters of NHL hockey games.

Massachusetts. Consequently, BPHA contends that the revenues it received from these agreements should not have been included in the numerator of BPHA's sales factor. We agree.[20]

When a taxpayer licenses its intangible property rights to a licensee that does not have its commercial domicil in Massachusetts, a fair reading of the 1995 regulation places the burden on the commissioner, not the taxpayer, to demonstrate that a greater proportion of the actual use of the license occurred in or was "geographically associated with" Massachusetts, rather than any other one State. 830 Code Mass. Regs. § 63.38.1(9)(d)(3)(c)(i). Having not produced any evidence on this point, the commissioner's burden has not been met. Accordingly, the revenues BPHA earned from these licensing agreements are not apportionable to Massachusetts for purposes of G. L. c. 63, § 38.[21]

d. *BPHA's partnership interest in NESN.* BPHA owned a thirty-one per cent partnership interest in NESN. NESN, a Massachusetts limited partnership with offices and a production studio in Boston, derived its revenue primarily from the sale of advertising placed within NESN programs and through

[20]The board, applying the 1999 amendments, disagreed. The board found that the commissioner properly included one hundred per cent of BPHA's share of the national and international broadcast license fees in the numerator of BPHA's sales factor for three reasons. First, BPHA's direct costs analysis improperly included the direct costs incurred by the NHL's sublicensees because under the regulations, "[a]ctual use shall not include activities of sublicensees . . . ." 830 Code Mass. Regs. § 63.38.1(9)(d)(3)(c)(i). Second, BPHA failed to consider the taxpayer's costs associated with developing and maintaining a marketable NHL franchise. Third, BPHA did not demonstrate that a greater portion of its income-producing activity associated with the licensing of broadcast rights was performed in any single State other than Massachusetts. As to the licensing of its logos and trademarks, the board similarly found that the "income-producing activity" included BPHA's costs in developing and maintaining its NHL franchise. As previously noted, we apply the 1995 version of the regulations and do not address the 1999 regulations. See note 10, *supra.*

[21]In a footnote in his brief, the commissioner argues that the board's overarching finding that the "income-producing activity" of BPHA is the "operation of [an] NHL franchise" in Massachusetts is sufficient to support the allocation of these licensing revenues to Massachusetts. Implicit in this argument is the suggestion that the specific regulations relating to the allocation of separately identifiable licensing revenues do not apply in these circumstances. We do not read the 1995 regulations to provide for such an exception.

broadcast licensing agreements with affiliated cable television operators (affiliates). The affiliates broadcast NESN's sports programming (including its. advertising) by way of satellite to their own subscribers whose subscriptions included the NESN channel.[22] The advertisers who purchased advertising placements on NESN programs were domiciled both within and outside Massachusetts. Similarly, some of the cable affiliates maintained corporate domicils in. Massachusetts and others, such as Time-Warner, maintained corporate domicils elsewhere.

The parties agree that 830 Code Mass. Regs. § 63.38.1 (9)(d)(3)(c) governs the apportionment of BPHA's pro rata share of NESN's advertising and licensing revenues because these revenues derive from the licensing of intangible property. BPHA argues, however, that income received from NESN's out-of-State cable affiliates and out-of-State advertisers should have been attributed to the commercial domicils of the affiliates and advertisers, pursuant to the regulatory presumption, and excluded from the numerator of BPHA's sales factor. The board rejected BPHA's argument and affirmed the commissioner's apportionment.[23] Applying the 1995 regulation, we affirm the commissioner's apportionment with respect to advertising revenue, albeit on a different ground, and uphold the commissioner's apportionment of affiliate revenue only with respect to cable affiliates commercially domiciled in Massachusetts.

The evidence before the board was that during the tax years in issue, between sixty-eight per cent and 72.1 per cent of all of the affiliates' subscribers to the NESN channel were domiciled in Massachusetts. Because the advertising placed on NESN programs was uniformly available to all of these subscribers, this evidence is sufficient to overcome the rebuttable presumption that the right granted to NESN's out-of-State advertisers was "used" in their commercial domicils, rather than in

---

[22]The affiliates paid NESN a fee under a formula based on their number of NESN subscribers.

[23]Specifically, the board found that BPHA's direct costs analysis should have included the production costs NESN incurred in Massachusetts and the costs incurred by BPHA in developing a marketable NHL franchise. The board also found that BPHA failed to demonstrate that a greater proportion of the income-producing activities associated with BPHA's partnership interest in NESN was performed in any single State other than Massachusetts.

Massachusetts. Consequently, BPHA's entire pro rata share of NESN's advertising revenue was properly apportioned to Massachusetts.

With respect to NESN's out-of-State affiliates, this same presumption of "use" was not rebutted. The over-all percentage of NESN subscribers residing in Massachusetts tells us nothing about where the majority of subscribers of each out-of-State affiliate resided. There is no evidence in the record on which to base a finding that the majority of NESN subscribers of any out-of-State affiliate such as Time Warner (domiciled in Connecticut) resided in Massachusetts, rather than in Connecticut or in New York or in some other New England State. In the absence of such evidence, the commissioner's apportionment of NESN's out-of-State affiliate licensing revenue to Massachusetts, and its consequent inclusion in the numerator of BPHA's sales factor, was erroneous.

3. *Property factor.* BPHA contends that the board erred in excluding from the denominator of BPHA's property factor BPHA's pro rata share of the capitalized value of the fees NESN paid to GE American Communications, Inc. (GE), for the use of two of GE's satellite transponders.[24] As previously noted, a corporation's property factor is a fraction, "the numerator of which is the average value of the corporation's real and tangible personal property owned or rented and used in this commonwealth during the taxable year and the denominator of which is the average value of all *the corporation's real and tangible personal property owned or rented and used during the taxable year*" (emphasis added). G. L. c. 63, § 38 (*d*). It is · undisputed that if the satellite transponders were "rented" within the meaning of the statute, their pro rated value would be included in the denominator.[25]

The board found that the satellite agreement at issue was a

[24]NESN paid GE American Communications, Inc. (GE), for the right to transmit its broadcasting signal to transponders on satellites GE owned, and to rebroadcast the signal back to earth, where NESN affiliates picked up the signal and distributed it to NESN's subscribers.

[25]BPHA argued both that NESN "rented" the transponders and that the transponders were not located in Massachusetts (but in outer space). Consequently, their value should be included in the denominator, but not in the numerator. Because we conclude that the board did not err in excluding

"service" contract, not a rental agreement, and thus the capitalized value of the transponders was not includable in either the denominator or the numerator, and was irrelevant to the calculation of BPHA's corporate excise taxes. This finding was reasonably based on the evidence. See *Alcoa Bldg. Prods., Inc.* v. *Commissioner of Revenue*, 440 Mass. 224, 229 (2003), quoting *Commissioner of Revenue* v. *Houghton Mifflin Co.*, 423 Mass. 42, 43 (1996) ("our review of the sufficiency of the evidence is limited to 'whether a contrary conclusion is not merely a possible but a necessary inference from the findings' ").

In support of the board's decision, the commissioner draws our attention to the fact that NESN and GE characterized their agreement as an agreement for services both in its title — "C-3 Preemptible Satellite Transponder Service Agreement" — and throughout its body. For example, the "scope" of the agreement is defined in part as follows: "GE Americom agrees to provide full-time Preemptible Transponder service to NESN, and NESN agrees to take such service from GE Americom, in accordance with the terms and conditions set forth in this Agreement, on one full-time Preemptible Transponder . . . ." While important, what the parties call their transaction is not conclusive of its nature. 1 American Law of Property § 3.3 (Casner ed. 1952). For that, we look to its substance.

BPHA contends that NESN's agreement with GE, no matter how characterized, was, in substance, a rental agreement. In support of its contention, BPHA cites to language in the regulations that "[r]ent is the actual sum in money or other consideration payable directly or indirectly by the taxpayer or for its benefit for the use of property, regardless of how such amounts may be designated," 830 Code Mass. Regs. § 63.38.1 (7)(f)(1) (1995), and argues that "NESN paid an 'actual sum in money' for the 'use' of a specific portion of a specific satellite," i.e., it "rented" the property. This argument is not persuasive. The regulation BPHA cites does not give guidance on whether property is "rented" by a taxpayer or merely made available by a provider as an integral part of the delivery of a

this item from the denominator, we do not decide whether the rent paid for property located in outer space should be included in the numerator as rent paid for property rented and used in Massachusetts.

service. Rather, it pertains only to the proper calculation of the capitalized value of rental property ("eight times its net annual rent"). In this context, the regulation specifically provides that charges for services, even if rendered by a landlord in the context of a bona fide lease (and characterized as part of the "rent") are not includable as "rent" for the purpose of calculating the property factor. *Id.*

More useful in analyzing whether an agreement is properly characterized as a rental agreement or an agreement for services are cases interpreting the Federal tax code. In *Xerox Corp.* v. *United States,* 656 F.2d 659 (Ct. Cl. 1981), the Court of Claims was faced with determining whether agreements entitled "Xerographic Machine Rental Service" were rental agreements or service agreements in connection with a claim by Xerox that certain of its machines qualified for an investment tax credit. The court, adopting the findings and rulings of the trial judge, held that the machines were provided to customers as part of a service agreement. Central to its ruling was the judge's conclusion that "in a lease, the customer (lessee) acquires a legal interest of some specified duration in the property itself, which enables it to exercise substantial control over the property including the right to deny access to others including the owner. By contrast, a service contract typically allows the owner access to its property and the right to freely substitute property in order to meet its contractual obligations." *Id.* at 675. In reaching this conclusion, the judge looked to Internal Revenue Service rulings that identified the following factors relevant to a determination that a "service" contract exists: (1) retention of property ownership by the taxpayer; (2) retention of possession and control of the property by the taxpayer; (3) retention of risk of loss by the taxpayer; and (4) reservation of the taxpayer's right to remove the property and replace it with comparable property. *Id.* at 674.

This analytic framework is readily applicable to the present case. Here, it is undisputed that GE owned the satellites on which the transponders used by NESN were located. Although the agreement at issue granted NESN "the exclusive right to use the . . . [t]ransponder" and the right to "sublet" it, GE retained "sole and exclusive control and operation of" the

satellite and the right to discontinue or suspend operation of the satellite and NESN's transponder if circumstances that GE reasonably believed posed a threat to the stable operation of the satellites occurred. Moreover, NESN did not contract for the right to exclusively occupy a particular transponder; rather, the agreement gave NESN the right to use any thirty-six Mega-Hertz transponder on the satellite "between transponder number thirteen and transponder number twenty four," to be identified by GE at a later date. The agreement also left the risk of loss largely on GE, granting NESN the right to cancel the agreement and receive a full refund in the event that GE was unable to provide service to NESN for thirty consecutive days. Finally, the agreement reserved GE's right to remove malfunctioning transponders and replace them with comparable transponders.[26] On these facts, a conclusion contrary to that reached by the board, although possible, was not necessary. *First Data Corp.* v. *State Tax Comm'n*, 371 Mass. 444, 446 (1976).[27]

4. *Commerce clause.* Finally, BPHA contends that the commissioner's interpretation and application of the apportionment formula and related regulations were unfair and led to a tax result out of proportion to the business BPHA transacted in Massachusetts, in violation of the commerce clause of the United States Constitution.[28] Having concluded that only a portion of NESN's income was properly apportioned to Mas-

---

[26]Specifically, the agreement provided that "[i]n the event a fully-protected transponder or a transponder-protected transponder on C-3 becomes a transponder failure, GE Americom shall attempt to restore the transponder failure, first, by utilizing a Replacement Transponder on the satellite on which the transponder failure occurred, on a first-needed, first-failed basis."

[27]In 1984, Congress amended the Internal Revenue Code to provide statutory guidance for distinguishing between leases and service contracts. 26 U.S.C. § 7701(e) (2002). The factors as codified in the statute are consistent with those factors listed in *Xerox Corp.* v. *United States*, 656 F.2d 659 (Ct. Cl. 1981), and with our resolution of this issue.

[28]The commissioner argues that BPHA asserted its commerce clause claim before the board only as it related to the commissioner's apportionment of gate receipts. As such, he maintains, BPHA waived its right to argue a constitutional claim as to the other issues now on appeal. BPHA's petition to the board, however, claimed that the commissioner's application of the apportionment formula to BPHA in general violated the commerce clause. Accordingly, we consider the claim in its entirety.

sachusetts, and that the licensing fees earned by BPHA in connection with licensing the national and international broadcast of its games and the use of its trademarks and logos were improperly apportioned to it, we sustain the remaining apportionment against BPHA's commerce clause claim.

"A State tax will be upheld 'against [a] Commerce Clause challenge when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.' " *Aloha Freightways, Inc.* v. *Commissioner of Revenue*, 428 Mass. 418, 421 (1998), quoting *Complete Auto Transit, Inc.* v. *Brady*, 430 U.S. 274, 279 (1977). At issue here is the second prong of that test. To be fairly apportioned, a tax must be both internally consistent and externally consistent. See *Container Corp. of Am.* v. *Franchise Tax Bd.*, 463 U.S. 159, 169-170 (1983). See also *Gillette Co.* v. *Commissioner of Revenue*, 425 Mass. 670, 680-681 (1997). Internal consistency is achieved where the apportionment formula is "such that, if applied by every jurisdiction, it would result in no more than all of the unitary business' income being taxed."[29] *Container Corp. of Am.* v. *Franchise Tax Bd.*, *supra* at 169. External consistency is achieved where "the State has taxed only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed." *Goldberg* v. *Sweet*, 488 U.S. 252, 262 (1989), citing *Container Corp. of Am.* v. *Franchise Tax Bd.*, *supra* at 169-170. "The Constitution does not '[invalidate] an apportionment formula whenever it *may* result in taxation of some income that did not have its source in the taxing State . . . .' Nevertheless, we will strike down the application of an apportionment formula if the taxpayer can prove by 'clear and cogent evidence' that the income attributed to the State is in fact out of all appropriate proportions to the business transacted . . . in that State." *Container Corp. of Am.* v. *Franchise Tax*

---

[29] "The three-factor formula adopted by the Legislature in G. L. c. 63, § 38 (*c*), is widely recognized as a fair method of apportioning net income." *Gillette Co.* v. *Commissioner of Revenue*, 425 Mass. 670, 681 (1997).

*Bd., supra* at 169-170, quoting *Moorman Mfg. Co.* v. *Bair,* 437 U.S. 267, 272, 274 (1978).[30]

Applying those principles, we have no difficulty in upholding the commissioner's application of the apportionment formula as to BPHA's revenues from gate receipts, local broadcasting licenses, and its share of NESN's advertising income. BPHA's essential income-producing activity, the operation of an NHL franchise, occurred in Massachusetts. Its executive and administrative offices were located here, and it received gate receipts only for hockey games played here. The three licensees of BPHA's local broadcasting rights were commercially domiciled in Massachusetts and their broadcasts were restricted to audiences in BPHA's home territory, which was centered in Massachusetts. Moreover, the advertising placed on NESN programs targeted NESN subscribers, approximately seventy per cent of whom resided in Massachusetts. For these reasons, we conclude that as to these revenues BPHA has not proved by clear and cogent evidence that the Massachusetts three-factor apportionment formula, which is "fair on its face," has operated in this case "to reach profits which are in no just sense attributable to [BPHA's] transactions within [Massachusetts]." *Hans Rees' Sons* v. *North Carolina ex rel. Maxwell,* 283 U.S. 123, 134 (1931).[31]

---

[30]Although BPHA has not raised a due process claim on appeal, fairness is a requirement under both the commerce clause and the due process clause of the United States Constitution. Under the commerce clause, an apportionment formula must "also not result in discrimination against interstate or foreign commerce." *Container Corp. of Am.* v. *Franchise Tax Bd.,* 463 U.S. 159, 170 (1983). The Supreme Court has held that, in the interstate context, "the antidiscrimination principle has not in practice required much in addition to the requirement of fair apportionment." *Id.* at 171. In the international context, "additional scrutiny" is necessary to avoid multiple taxation. *Id.* at 185. BPHA has failed to show, however, that it paid taxes on gate receipts and other revenues in both Massachusetts and Canada. " '[S]peculative concerns with multiple taxation' provide [an] insufficient basis for invalidating a tax derived from a reasonable apportionment formula reasonably applied." *W.R. Grace & Co.* v. *Commissioner of Revenue,* 378 Mass. 577, 589 (1979), quoting *Moorman Mfg. Co.* v. *Bair,* 437 U.S. 267, 280 (1978).

[31]We decline to adopt, as BPHA urges, the Pennsylvania Supreme Court's reasoning in *Philadelphia Eagles Football Club* v. *Philadelphia,* 573 Pa. 189 (2003), in which it held that the broadcast licensing fees the Philadelphia Eagles Football Club received for the telecast of away games were improperly

5. *Conclusion.* The board's apportionment of BPHA's gate receipts and local licensing revenues is affirmed, as is the board's determination that the property factor should not be adjusted for BPHA's pro rata share of the value of the satellite transponders NESN used to transmit its signal. With respect to the apportionment of revenue BPHA received from its interest in NESN, and from the NHL and NHL entities for national and international broadcast rights, and for the use of Bruins logos and trademarks, the board's determinations are vacated, and the matter remanded to the board for a recalculation of the proper taxes and abatements due BPHA and the Jacobses for tax years 1991-1994, consistent with this opinion.

*So ordered.*

---

apportioned to Philadelphia. *Id.* at 227-228. As the dissent in that case duly notes, a focus on individual games not only ignores the tax regulations that govern the apportionment of revenues from licensing arrangements, but it is also "both artificial and impractical" as it would require a taxing State to calculate and collect taxes on the licensing fees received by nonresident teams for playing away games in the taxing State. *Id.* at 238 (Castille, J., concurring and dissenting). "Calculation and collection of those taxes would require considerable effort on the part of the [States] in which . . . games are played, inevitably would result in disputes and litigation . . . and would lead to unevenness in application." *Id.* at 238-239 (Castille, J., concurring and dissenting).