APPEALS COURT 
 
 CRAIG H. WELCH & another[1] vs. COMMISSIONER OF REVENUE

 
 Docket:
 24-P-109
 
 
 Dates:
 January 14, 2025 – April 3, 2025
 
 
 Present:
 Grant, Brennan, & Toone, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Taxation, Income tax, Capital gain, Abatement. Corporation, Stock. Sale, Of stock. Statute, Construction. Administrative Law, Agency's interpretation of statute.
 
 

       Appeal from a decision of the Appellate
Tax Board.  
      Michael J. Bowen (Eric P. Rothenberg also
present) for the taxpayers.
      Celine E. de la Foscade-Condon for
Commissioner of Revenue.
      GRANT, J. 
In this case, we consider whether the Commissioner of Revenue
(commissioner) may treat as Massachusetts source income the gain realized by
Craig H. Welch (Welch) and his spouse, Natalia I. Welch (collectively, the
Welches), from the sale of stock in Welch's former employer, AcadiaSoft, Inc.
(AcadiaSoft).2  Welch acquired the stock
in 2005 soon after founding AcadiaSoft and continued to work for AcadiaSoft in
Massachusetts, where he also resided, for the next decade, but was no longer a
Massachusetts resident when he sold the stock in 2015.  The Welches appeal from a decision of the
Appellate Tax Board (board) concluding that they were not entitled to an
abatement of Massachusetts income tax on Welch's gain from that sale.
      The central issue before us is whether the
gain from that sale was Massachusetts source income subject to tax under
G. L. c. 62, § 5A, and 830 Code Mass. Regs.
§ 62.5A.1(3)(c)(8) (2006) (regulation). 
In the circumstances of this case, we conclude that Welch's gain from
the sale was "derived from or effectively connected with" his trade
or business or employment at AcadiaSoft, G. L. c. 62,
§ 5A (a), even though at the time of the sale he was no longer
"actively engaged in a trade or business or employment in the
commonwealth," id.  Accordingly, we
hold that the gain was Massachusetts source income and affirm the board's
decision.
      Background.  The case was submitted to the board on a
statement of agreed facts with attached exhibits, including deposition
testimony of Welch and outside counsel for AcadiaSoft.  We summarize the facts found by the board,
supplemented by other uncontested facts.
      AcadiaSoft develops and markets derivative
and collateral management solutions for institutional investors.  At all relevant times, AcadiaSoft was
headquartered in Massachusetts and filed Massachusetts corporate excise tax
returns apportioning one hundred percent of its income to Massachusetts.
      In 2003, Welch formed AcadiaSoft as a
Massachusetts corporation.  He was its
sole stockholder and held the titles of president, treasurer, clerk, and sole
director.  That corporation was
voluntarily dissolved, and in 2005, another Massachusetts corporation by the
same name was organized.  Welch was its chief
executive officer (CEO) and treasurer, and Danny J. Moyse, a software engineer,
was its chief technology officer, president, and secretary.  Welch and Moyse were AcadiaSoft's sole
directors, and each held a fifty percent interest in its common stock.
      Between 2003 and 2015, Welch worked
exclusively for AcadiaSoft.  In AcadiaSoft's
early years, Welch's main focus was sales. 
He described himself as AcadiaSoft's "chief evangelist":  he "created the desire for the product
with the potential customers," "designed what the product needed to
do," "sold it," and "financed it."  During 2003 through 2009, he worked about
eighty hours each week.  However, he
reported no wage income for 2003 through 2005. 
He reported only minimal income in 2006 ($5,533.77) and 2007
($7,235.42).  Welch expected that in the
future AcadiaSoft would be worth a lot more than it was when he started it, and
he was looking forward to the payout from his hard work, "[w]henever that
came."
      In 2006 and 2007, AcadiaSoft raised
funding from a group of "angel" investors -- individuals who did not
work for the company but who became the holders of 28.[2] percent of its common
stock.  Welch promised he would do his
best to get them "a handsome return" on their investment.  As a result of that recapitalization, Welch's
share of AcadiaSoft stock was diluted to 35.9 percent.
      Until about 2009, Welch and Moyse were
running AcadiaSoft from their respective homes, both located in
Massachusetts.  Welch primarily worked in
Massachusetts.  About twice a month he
traveled to New York to solicit funding, but he returned home to Massachusetts
the same day.
      In 2009, AcadiaSoft merged into a Delaware
corporation by the same name.  AcadiaSoft
then entered into a transaction by which it obtained funding from financial
services firms, resulting in the dilution of Welch's share of AcadiaSoft stock
to approximately thirteen percent.  In
addition, Welch became bound by an agreement that identified him as a
"[k]ey [h]older" of AcadiaSoft stock and provided him with a
financial incentive to remain employed by AcadiaSoft:  if within the next eighteen months Welch left
AcadiaSoft's employment in certain circumstances, AcadiaSoft would have an
option to purchase his shares for one cent per share, adjusted for transactions
including stock splits.  With funds from
that 2009 transaction, AcadiaSoft obtained office space in Pembroke.  Welch went to the office about once a month
but continued to work mainly out of his home in Lynnfield.
      Beginning in 2010, Welch was the CEO of
AcadiaSoft.[3]  He focused on operations,
management, and sales.  All AcadiaSoft
personnel reported to Welch, and he was involved in matters including hiring,
assessing legal claims, formulating business plans, and seeking equity
financing.
      In about 2012, AcadiaSoft's office moved
to Norwell.  Welch went to the Norwell
office usually once a week, but otherwise he worked from his home in
Lynnfield.  Welch traveled frequently to
New York and London on business, but AcadiaSoft did not have an office in
either city.
      In 2013, AcadiaSoft entered into another
round of financing with financial services firms.  As a result, Welch's share of AcadiaSoft
stock was further diluted to 11.86 percent, where it remained until he left the
company in 2015.
      Beginning in about 2014, Welch perceived
tension between himself and one or more of the other AcadiaSoft directors, and
he became concerned that his so-called "sweat equity" was in
jeopardy.  By January 2015, Welch was CEO
in name only:  he no longer had any operational
role in AcadiaSoft but retained the CEO title at the request of the board of directors
because he was "high profile" in the industry.
      For the years 2003 through 2014, the
Welches filed Massachusetts resident income tax returns.  The Welches moved to New Hampshire on or
about April 30, 2015, which was the last day of the Welches' Massachusetts
residency.[4]
      In June 2015, AcadiaSoft offered to
purchase Welch's shares, contingent on all the holders of common stock agreeing
to sell their shares.  Welch accepted the
offer and, on June 26, signed a letter resigning as an officer and director of
AcadiaSoft, but he made his resignation contingent on the sale of his shares so
that he could retain some leverage in the form of his founder's veto in the
event that the sale did not occur. 
AcadiaSoft entered into another round of financing and then purchased
the entirety of Welch's shares.
      AcadiaSoft issued Welch a 2015 1099-B tax
form reporting that, on June 29, 2015, Welch had received cash proceeds of
$4,744,759.96, with no cost or other basis, for the sale of his shares.  For 2015, the Welches filed a Massachusetts
nonresident/part-year resident tax return, on which they reported that amount
as having been included as a capital gain on their Federal tax return.  On their Massachusetts tax return, the Welches
did not include the $4,744,759.96 gain as income from a Massachusetts source.
      After an audit, the commissioner notified
the Welches of an assessment totaling $335,968.62 in tax, interest, and
penalties based on the gain realized by the sale of the AcadiaSoft stock.  The Welches applied for an abatement, which
was deemed denied after months of inaction. 
The Welches appealed to the board from the denial of abatement.  The board ruled that Welch's gain from the sale
of his AcadiaSoft shares was Massachusetts source income because it was effectively
connected with his trade, business, or employment in Massachusetts within the
meaning of G. L. c. 62, § 5A (a).  The Welches appeal.
      Discussion.  1. 
Standard of review.  "We
defer to the board's expertise with respect to the interpretation of tax laws
in the Commonwealth."  U.S. Auto
Parts Network, Inc. v. Commissioner of Revenue, 491 Mass. 122, 127-128 (2022),
quoting VAS Holdings & Invs. LLC v. Commissioner of Revenue, 489 Mass. 669,
674 (2022) (VAS Holdings).  See Oracle
USA, Inc. v. Commissioner of Revenue, 487 Mass. 518, 522 (2021) ("Because
the board is an agency charged with administering the tax law and has expertise
in tax matters, we give weight to its interpretation of tax statutes"
[citation and alteration omitted]). 
"If the board's construction of a tax law 'is reasonable, we will
defer to its interpretation.'" 
Reagan v. Commissioner of Revenue, 491 Mass. 446, 451 (2023), quoting
Oracle USA, Inc., supra.  At the same
time, "[w]e adhere to the familiar principle that tax statutes are to be
strictly construed; we will not read into a statute an authority to tax that it
does not plainly confer[,]" and "[a]ny ambiguity is resolved in the
taxpayer's favor" (citations omitted). 
Commissioner of Revenue v. Oliver, 436 Mass. 467, 470-471 (2002).  "We will not reverse a decision of the
board if it is based on substantial evidence and on a correct application of
the law" (quotation and citation omitted). 
U.S. Auto Parts Network, Inc., supra at 128.
      2. 
Statutory interpretation.  We
start with the plain language of the statute as in effect on June 29, 2015,
when Welch sold his AcadiaSoft shares. 
The statute empowered the commissioner to tax nonresidents on their
Massachusetts source income, which it defined to include
"items of
gross income derived from or effectively connected with . . . any
trade or business, including any employment carried on by the taxpayer in the
commonwealth, whether or not the nonresident is actively engaged in a trade or
business or employment in the commonwealth in the year in which the income is
received" (emphasis added).
G. L.
c. 62, § 5A (a).  In 2003,
the Legislature amended § 5A (a) to add the words underlined
above.  See St. 2003, c. 4, § 7
(2003 amendment).[5]
      Before the 2003 amendment, Massachusetts
courts construed the prior version of the statute as not permitting taxation of
income derived from a nonresident's Massachusetts employment in a prior
year.  See Oliver, 436 Mass. at 474
(prior version of § 5A did not permit taxation of nonresident on pension
benefits earned from past Massachusetts employment); Destito v. Commissioner of
Revenue, 23 Mass. App. Ct. 977, 978 (1987) (reading prior version of § 5A
to imply that for income earned by nonresident to be taxable, it must be
received within same tax year as nonresident worked in Massachusetts).  "As amended, the statute now permits a
tax on a nonresident who did business in the Commonwealth regardless of whether
the business was conducted in that particular year."  VAS Holdings, 489 Mass. at 688 n.23.
      Before the 2003 amendment, § 5A also
did not define the phrase "derived from or effectively connected with any
trade or business."  By the 2003
amendment, the Legislature added the following language:
"For
purposes of this section, gross income derived from or effectively connected
with any trade or business, including any employment, carried on by the
taxpayer in the commonwealth shall mean the income that results from, is earned
by, is credited to, accumulated for or otherwise attributable to either the
taxpayer's trade or business in the commonwealth in any year or part thereof,
regardless of the year in which that income is actually received by the
taxpayer and regardless of the taxpayer's residence or domicile in the year it
is received.  It shall include, but not
be limited to, gain from the sale of a business or of an interest in a business
. . . ."
G. L.
c. 62, § 5A (a), as amended by St. 2003, c. 4, § 7.
      In construing that language added by the
2003 amendment, the board noted that § 5A (a) "incorporates an
exceedingly broad definition" of the phrase "derived from or
effectively connected with any trade or business."  That definition includes the list of phrases
"results from, is earned by, is credited to, accumulated for or otherwise
attributable to," and specifically enumerates sources of taxable income as
including what occurred here:  "gain
from the sale of . . . an interest in a business."  G. L. c. 62, § 5A (a).
      The board's interpretation of
§ 5A (a) is further informed by the regulation.  As in effect on June 29, 2015, the regulation
stated,
"Income from
a trade or business may include income that results from the sale of
. . . an interest in a business. 
This rule . . . generally does not apply . . . to
the sale of shares of stock in a C or S corporation, to the extent that the
income from such gain is characterized for federal income tax purposes as
capital gains. . . .  Such
gain may . . . give rise to Massachusetts source income if, for
example, the gain is otherwise connected with the taxpayer's conduct of a trade
or business, including employment (as in a case where the stock is related to
the taxpayer's compensation for services) . . . ."[6]  (Emphases added.)
830 Code Mass.
Regs. § 62.5A.1(3)(c)(8).
      Focusing on the word "not"
underlined above, the Welches argue that the regulation means that the
commissioner may not treat as Massachusetts source income Welch's gain from the
sale of his shares in AcadiaSoft, a C corporation.[7]  As the commissioner points out, however, in
that sentence, the word "not" is qualified by the word
"generally."  See Bartenwerfer
v. Buckley, 598 U.S. 69, 78 (2023) ("[a]s the word 'generally' indicates,
[the] rule is not absolute").  Read
as a whole, the regulation makes clear that the gain from the sale of stock in
a C corporation may constitute Massachusetts source income if "the stock
is related to the taxpayer's compensation for services."  830 Code Mass. Regs. § 62.5A.1(3)(c)(8).
      We conclude that the board's
interpretation of § 5A (a) is reasonable.  See VAS Holdings, 489 Mass. at 674.  Against that statutory and regulatory
framework, this case turns on whether Welch's gain from his AcadiaSoft shares
was "derived from or effectively connected with" his trade or
business or employment, G. L. c. 62, § 5A (a), or "related to
[his] compensation for services," 830 Code Mass. Regs.
§ 62.5A.1(3)(c)(8).
      3. 
Application to this case. 
Applying § 5A (a) to "the unique circumstances" of
this case, the board concluded that Welch's gain from the sale of his AcadiaSoft
shares was "compensatory" and "a remuneration that derived from
and was effectively connected with his AcadiaSoft employment."
      At oral argument, the Welches contended
that the board's determination that Welch's gain was "compensatory"
is a conclusion of law that we should review de novo.  The commissioner countered that it is a
finding of fact to which we should defer. 
We view it as a mixed question of fact and law, and accord "some
deference" to the board's decision. 
Boston Professional Hockey Ass'n v. Commissioner of Revenue, 443 Mass.
276, 285 (2005), quoting Koch v. Commissioner of Revenue, 416 Mass. 540, 555
(1993) ("In reviewing mixed questions of fact and law, the board's
expertise in tax matters must be recognized, and its decisions are due 'some
deference'").
      The board concluded that Welch "was
not a passive investor in AcadiaSoft, but a founder whose continued employment
with the company ‑‑ in prominent, powerful, and crucial roles -- contributed to
its value."  He "exclusively
devoted his life for more than a decade" to AcadiaSoft, "to which he
made crucial contributions that added to, and were critical to, the company's
value."  The board emphasized
several events that linked Welch's ownership of AcadiaSoft stock to his
compensation.  He acquired that stock
soon after he founded AcadiaSoft, dedicated himself to the success of
AcadiaSoft, and expected a payout for his sweat equity.  In connection with the 2009 refinancing, he
became bound by an agreement that tied his status as a key holder of AcadiaSoft
stock to his continued employment with the company.  Finally, Welch made his resignation from
AcadiaSoft contingent on the sale of his shares.
      The Welches argue that Welch's gain from
the sale of his AcadiaSoft shares was not "derived from or effectively
connected with" his trade or business or employment within the meaning of
§ 5A (a).  They advance two
arguments, neither of which persuades us that the board erred.
      First, focusing on the terms "trade
or business" in § 5A (a), the Welches argue that it was
AcadiaSoft that conducted the trade or business of developing and marketing
derivative and collateral management solutions, not Welch personally.[8]  This argument is unavailing because, as the
Welches acknowledge, the gain is taxable if it derived from Welch's trade or
business of working for AcadiaSoft.  On
that point, the Welches argue that the stock was not compensation for Welch's
employment because AcadiaSoft had not yet conducted any business when Welch
acquired the stock in 2005, there is no evidence of an explicit agreement that
the shares were issued as compensation, and he was later paid a salary.  While it is true that in many circumstances
when an employee of a corporation receives stock, the employer formally
designates it as compensation, see, e.g., Jones v. Jones, 101 Mass. App. Ct.
673, 682 n.13 (2022), the absence of such a formal designation is not
determinative of the issue before us. 
Here, because Welch obtained the stock soon after founding AcadiaSoft,
expected that in the future AcadiaSoft would be worth a lot more than it was
when he started it, and was looking forward to the payout from his hard work,
the board had substantial evidence on which to base its determination that
Welch's gain from the sale of the AcadiaSoft stock was derived from his
employment.
      Second, the Welches contend that Welch
held his AcadiaSoft shares as an investment. 
They point to the regulation's example (3)(c)(8.4), which posits that,
where an employee of a Massachusetts corporation lives out of State and
"purchases stock" in his employer's corporation "as an ordinary
investment unrelated in any way to his compensation," gain from the sale
of that stock would not be treated as Massachusetts source income.  That example is not on point here because
Welch did not "purchase" his AcadiaSoft shares, and, as discussed
above, his acquiring the stock was related to his compensation.
      We conclude that the board had substantial
evidence on which it based its determination that Welch's gain from the sale of
his AcadiaSoft shares was derived from his own trade or business of software
development.  See Commissioner of
Internal Revenue v. Groetzinger, 480 U.S. 23, 35 (1987) (full-time gambler was
engaged in "trade or business" within meaning of 26 U.S.C.
§§ 162[a] and 62[1]; "to be engaged in a trade or business, the
taxpayer must be involved in the activity with continuity and regularity and
. . . the taxpayer's primary purpose for engaging in the activity
must be for income or profit").
      Conclusion.  The board determined that Welch's gain from
the sale of his shares of AcadiaSoft stock was "derived from and was
effectively connected with" his trade or business or employment, and
therefore it was taxable as Massachusetts source income.  We conclude that the board's decision was
based on substantial evidence and a correct application of the law.
Decision of the
Appellate Tax Board affirmed.

footnotes

[1] Natalia I.
Welch.

[2] During
Welch's employment, AcadiaSoft took three different corporate forms, each of
which was called by the same name.  We
use that name to refer to each of them.

[3] Moyse had
served as CEO for several months beginning in December 2009.

[4] The
commissioner does not argue that when Welch sold his AcadiaSoft shares on June
29, 2015, his domicile was Massachusetts, and so we do not consider that issue.

[5] The
Legislature has made additional amendments to the statute since then, but none
of those amendments have altered the quoted language.

[6] The
regulation also provides that "gain from . . . the disposition
of shares of corporate stock will be considered Massachusetts source income if
it is treated as compensation for federal income tax purposes."  830 Code Mass. Regs.
§ 62.5A.1(3)(c)(8).  The parties do
not argue that that part of the regulation applies, and so we do not consider
the issue.

[7] After its
2009 merger into the Delaware corporation, AcadiaSoft was taxed as a C corporation.  See Bernier v. Bernier, 449 Mass. 774, 775
n.2 (2007).

[8] The Welches
rely on Oliver, in which the court, construing the pre-2003 amendment version
of § 5A, concluded that a retiree living out of State and receiving a
pension from his former employer in Massachusetts did not "personally
conduct the Massachusetts business giving rise to the income."  Oliver, 436 Mass. at 472, quoting
Commissioner of Revenue v. Dupee, 423 Mass. 617, 620 (1996).  Oliver is inapposite.  At the time, § 5A permitted taxation of
a nonresident who conducted business in the Commonwealth during the taxable
year at issue.  The version of
§ 5A (a) at issue here permits taxation of a nonresident who conducts
business in the Commonwealth "regardless of whether the business was
conducted in that particular year," VAS Holdings, 489 Mass. at 688 n.23.